Affirmed and Memorandum Opinion filed May 17, 2011.

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-10-00219-CR



 

Raymond Deleon Aluiso, II, Appellant

V.

The State of Texas, Appellee

 



On Appeal from the 23rd District
Court

Brazoria County, Texas

Trial Court Cause No. 57336



 

MEMORANDUM  OPINION

 

Raymond Deleon Aluiso, II appeals his murder
conviction[1]
on the grounds that the evidence is legally and factually insufficient to
support his conviction.  A jury found appellant guilty and assessed punishment
at confinement for 99 years and a $10,000 fine.  We affirm.

Background

            Appellant was
indicted for the murder of the complainant Alejandro Nava on June 12, 2008.  A
four-day jury trial was held on February 1, 2010.

            Vanessa Ramirez, appellant’s
former girlfriend and the mother of his young daughter, testified at trial. 
Ramirez said she was at home with her new boyfriend, the complainant Alejandro
Nava, and her son and daughter at approximately 12:30 a.m. on April 23, 2008 when
she heard someone knock on the back door of her house.  Ramirez opened the door
and saw appellant standing at the back door.  Appellant “was crying, telling [Ramirez]
that he wanted to see his daughter.”  

Ramirez went to the living room to get their
daughter.  She stepped outside with their daughter in her arms to talk to
appellant.  Ramirez testified that appellant asked if he could see his daughter
“now that [Ramirez has] a boyfriend.”  Appellant kept telling Ramirez that “he
wants to see her, that now he can see his daughter.”  When Ramirez told
appellant that he could not come late to the house and needed to call before
coming over, appellant became upset and questioned Ramirez about who was at her
house.  Ramirez and appellant started arguing about appellant “not being there”
for their daughter.  

Ramirez repeatedly asked appellant to leave.  As she
opened the door to enter her house, appellant pushed Ramirez and their daughter
out of the way and ran into the house.  No one was in the living room so
appellant ran into the hallway.  The complainant was in the doorway of the
master bedroom.  Appellant ran to the complainant and aggressively “bucked up
to him sideways.”  The complainant told appellant to “chill” but appellant
punched the complainant in the face with his fist.  Ramirez observed appellant
and the complainant “shoving each other” and “grabbing on  each other.” 
Ramirez did not see a weapon.

The complainant then punched appellant, and appellant
dropped on the floor.  When appellant got up, he grabbed the complainant in a
“bear hug.”  The complainant pushed appellant off of him and ran in the living
room toward the house’s front door.  Ramirez followed the complainant. 
Appellant also came to the living room; appellant was “laughing and saying ‘got
him, got him.’”  Ramirez then noticed blood dripping down the complainant’s
face and the left side of his stomach.  The complainant fell against the wall
and then fell on the floor.  Ramirez was holding the complainant and applied
pressure to his stomach in an effort to stop the bleeding.  

Appellant left Ramirez’s house slamming the back door
behind him.  Appellant then returned to the house, and Ramirez saw appellant
pick up something from the living room floor and run out the back door again. 
Ramirez did not know what appellant picked up from the floor.  

Ramirez’s brother later arrived at her house, and he
called 911.  Ramirez testified that she did not see appellant or the
complainant with a weapon; she also testified that the complainant had no
wounds and was not bleeding before the fight with appellant.  Ramirez admitted
that she had smoked a “joint amount” of marihuana with the complainant before
appellant came to her house.  She denied being intoxicated.

Dispatcher Klarisa Yzquierdo McEntire testified that
she answered a 911 call reporting a stabbing in the early morning hours of
April 23, 2008.  McEntire sent police officers and an ambulance to the Ramirez
residence.

Freeport Police Officer John Rutherford testified that
he was dispatched to Ramirez’s house. He was the first to respond and arrived
approximately five to 10 minutes after the complainant was stabbed.  When he
arrived, the complainant was still alive.  Officer Rutherford was able to speak
to the complainant and determine that the complainant was in severe pain from
stab wounds.  

Officer Rutherford also spoke to Ramirez for 10 to 15
minutes.  He did not believe Ramirez was intoxicated; Ramirez was focused and
spoke in clear and complete sentences.  Officer Rutherford testified that a
warrant for appellant’s arrest was issued on April 23, 2008 and that he
arrested appellant for the complainant’s murder on May 10, 2008.

Freeport Detective Bruce Houston testified that he received
a call at approximately 1:30 a.m. on April 23, 2008 to investigate the
complainant’s death.  At Ramirez’s house, Detective Houston saw blood on the
back door screen and collected swabs from the blood on the door.  He later also
collected swabs and saliva samples from appellant’s mouth.  Detective Houston testified
that he interviewed Ramirez at the Freeport Police station on the night of the
stabbing; Ramirez did not appear to be intoxicated.

Forensic scientist Christy Wimsatt testified that she
performed a DNA analysis of the swabs Detective Houston took from appellant and
the blood on Ramirez’s back door screen.  Wimsatt conducted a DNA comparison;
the results of the comparison established that the DNA profile from appellant’s
swabs matched the DNA profile from the swabs of blood found on the back door
screen in Ramirez’s house. 

The Galveston County deputy medical examiner, Dr.
Nobby Mambo, testified that he performed an autopsy on the complainant’s body
on April 23, 2008.  Dr. Mambo noted the complainant was a “very healthy normal
individual.”  He determined that the complainant died from a stab wound “just
underneath the nipple.”  Dr. Mambo determined that the complainant suffered “a
stab wound because it had most of the fissures of a stab wound caused by a
knife or a serrated blade.”

In Dr. Mambo’s opinion, the stab wound was caused by
a knife, knife-like object, or sharp object.  Dr. Mambo opined that the
knife-like or sharp object travelled about four inches into the complainant’s body
between his ribs and punctured his heart.  Dr. Mambo also opined that this
wound caused the complainant’s death.  Although the complainant had some superficial
wounds on his head, left rib cage, left arm, wrist, elbow, and armpit, these
wounds would not have caused the complainant’s death either independently or
cumulatively.  

Christina Arechiga, who was appellant’s girlfriend at
the time of the stabbing, testified that she went to sleep at approximately 10
p.m. on April 22, 2008.  Arechiga later heard appellant leave their trailer and
drive away.  At some point, appellant woke her up when he “banged on the door”
of the trailer; however, Arechiga could not remember at what time appellant
returned to the trailer.  Arechiga opened the door; she saw appellant standing
there without a shirt on and his shirt was wrapped around one of his hands. Arechiga
testified that appellant “was rushing [her].  He was telling [her] come on,
let’s go, let’s go.” 

Arechiga thought appellant’s behavior was unusual;
nonetheless, she got dressed and left with appellant in a gray Dodge Charger —
appellant was not driving his black truck.  She did not know where appellant
was driving to.  Arechiga noticed blood on the car’s steering wheel and gear
shift; she realized that appellant had a cut on one of his fingers.  Arechiga
characterized appellant’s driving as “crazy;” he was speeding and he was “just
out of control.”  She testified that appellant's behavior was “[o]ut of
control,” he was “sweating and just panicking.”

When Arechiga first asked him what was going on,
appellant told her to “be quiet and to let him think.”  Arechiga asked him
again later what was going on and appellant told her that he had gone to
Ramirez’s house; “he had gotten into an argument, into a fight with her
boyfriend;” and the complainant started fighting with him first.  Appellant
refused to tell Arechiga what specifically happened between appellant and the
complainant.  However, appellant “kept on saying, ‘What have I done, what have
I done.’”

Arechiga testified that she became mad at appellant
because she “didn’t know what he had done.  [She] knew it was something bad.” 
Arechiga asked appellant to stop the car, but appellant continued driving.  He
drove to their friend’s house in Angleton; dropped Arechiga off there; and
drove off alone.  Arechiga testified that they arrived at the friend’s house in
“the early morning hours of April 23rd, 2008.”  Appellant later called Arechiga
to tell her “[t]hat he was sorry and that he didn’t mean to do whatever he
did.”

Arechiga’s brother, Marco Santoya, also testified at
trial.  Santoya testified that he saw appellant rent a gray Dodge Charger on
April 22 or 23, 2008.  Santoya also testified that he did not know appellant “to
carry a knife on him, like a pocketknife.”  However, after refreshing his
memory, Santoya admitted to earlier “testifying that [appellant] always carried
a knife with him.”

Finally, Ida Robertson testified that appellant had called
her between 2:30 and 3:00 a.m. on April 23, 2008.  She testified that appellant
had told her that “something bad had happened.”  Robertson acknowledged that
she had given a statement to a Freeport police officer, but she could not
remember if appellant had told her, “I’ve been bad, Mama,” or if he had told
her that “something bad has happened.”  Robertson testified that she could not
remember testifying before the grand jury on May 22, 2008 that appellant had
told her, “I’ve been bad, Mama.”  

The State then questioned Robertson: “So you did not
testify ‘I’ve been bad, Mama,’ and you were asked, ‘Yeah, right?’  And then you
testified, ‘I did something bad is what — exactly what he said.’ You don’t
remember testifying to that?”  Robertson responded that “[T]he wording has
changed but, yeah, it was something to that effect.”  Robertson also testified
that she and appellant never talked about what had happened on April 23, 2008.

The jury found appellant guilty of murder.  Appellant
pled true to two enhancement paragraphs alleging that appellant committed two
prior felony offenses.  After the punishment phase of the trial, the jury
assessed appellant’s punishment at confinement for 99 years and a $10,000
fine.  Appellant filed a timely appeal raising two issues.

Analysis

            In his first and
second issues, appellant argues that the evidence is legally and factually
insufficient to support his murder conviction.

We address appellant’s sufficiency challenges under a
single standard for evaluating legal sufficiency of the evidence to support a
finding required to be proven beyond a reasonable doubt.  See Brooks
v. State, 323 S.W.3d 893, 895, 912 (Tex. Crim. App. 2010) (plurality
opinion) (holding that the Jackson v. Virginia, 443 U.S 307 (1979) legal
sufficiency standard is the only standard that a reviewing court should apply
in determining whether the evidence is sufficient to support each element of a
criminal offense that the State is required to prove beyond a reasonable doubt);
id. at 913-14 (Cochran, J., concurring) (concluding that a separate
factual sufficiency standard no longer applies in criminal cases).  That
standard requires us to determine whether, after considering all the evidence
in the light most favorable to the verdict, a jury was rationally justified in
finding guilt beyond a reasonable doubt.  Id. at 902 (plurality
opinion).

Reconciling conflicting evidence is within the
exclusive province of the jury.  See Wesbrook v. State, 29 S.W.3d
103, 111 (Tex. Crim. App. 2001).  The jury may choose to believe some testimony
and disbelieve other testimony.  Lancon v. State, 253 S.W.3d 699, 707
(Tex. Crim. App. 2008).  A jury is in the best position to evaluate the
credibility of witnesses, and we afford due deference to the jury’s
determinations.  See id. at 705; Marshall v. State, 210 S.W.3d
618, 625 (Tex. Crim. App. 2006). 

The State is not required to present direct evidence,
such as eyewitness testimony, to establish guilt.  See Guevara v. State,
152 S.W.3d 45, 49 (Tex. Crim. App. 2004). “Circumstantial evidence is as
probative as direct evidence in establishing guilt of the actor, and
circumstantial evidence alone can be sufficient to establish guilt.”  Hooper
v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).  The logical force of
the combined pieces of circumstantial evidence in the case, coupled with reasonable
inferences from them, may be sufficient to establish guilt.  Evans v. State,
202 S.W.3d 158, 166 (Tex. Crim. App. 2006).  The law does not require that each
fact “point directly and independently to the guilt of the appellant, as long
as the cumulative force of all the incriminating circumstances is sufficient to
support the conviction.”  Hooper, 214 S.W.3d at 13; see Guevara,
152 S.W.3d at 49.  

A person commits murder if he (1) intentionally or
knowingly causes the death of an individual; or (2) intends to cause serious
bodily injury and commits an act clearly dangerous to human life that causes
the death of an individual.  Tex. Penal Code Ann. § 19.02 (b) (Vernon 2003).

Appellant contends that the evidence is insufficient
to support his murder conviction because (1) the evidence does not show
appellant stabbed the complainant with a knife or sharp object; (2) the State
presented no evidence that appellant had a weapon to stab the complainant; (3)
there was no testimony that appellant “made stabbing motions which the jury
could rely on in finding [a]ppellant used some object to stab [the complainant]
or that [the complainant] attempted to retreat into the bedroom he stood at the
doorway of;” (4) “the State was unable to present any evidence that [the
complainant]’s blood was found on [a]ppellant’s clothing,” or in the car
appellant drove the night of the stabbing; (5) “[i]t is reasonable to conclude
[a]ppellant suffered an injury to his fist, a common result in a fist fight,
and the blood . . . Christina Arechiga witnessed . . . was that of the
[a]ppellant;” (6) there is no evidence excluding Vanessa Ramirez and her
brother as the ones who “committed the murder of [the complainant] after [a]ppellant
fought with the complainant;” (7) there is no direct evidence indicating appellant
inflicted the complainant’s injury causing his death; and (8) “[a]lthough the
evidence showed [a]ppellant inflicted blows to [the complainant] with his fist,
no testimony was provided to show [a]ppellant stabbed [the complainant], no
weapon was recovered, and no evidence supports [a]ppellant even possessed an
object to stab [the complainant].”

Based on the record before us, there is sufficient
evidence to support appellant’s murder conviction.  

The jury heard evidence that appellant and Ramirez
had an argument outside of Ramirez’s house on April 23, 2008.  Ramirez asked
appellant to leave, but he refused.  Instead, appellant pushed Ramirez and
their daughter out of the way and ran into the house to see who was with
Ramirez at the house.  Appellant aggressively approached the complainant, who
was neither injured nor bleeding at the time, and then punched him in the
face.  Although Ramirez did not see a weapon, she did observe appellant and the
complainant “shoving each other,” “grabbing on each other,” and “pushing back
and forth.”  After appellant grabbed the complainant in a “bear hug,” the
complainant pushed appellant off of him and ran toward the house front door.

Ramirez testified that she followed the complainant
while appellant was in the living room “laughing and saying ‘got him, got
him.’”  Ramirez noticed that blood was dripping down the complainant’s face and
the left side of his stomach.  Ramirez testified that the complainant was not
bleeding and had no wounds before his fight with appellant.  The complainant
collapsed on the floor, and appellant fled the house.  Appellant returned to
the house to retrieve something from the living room floor.  Thereafter, he
immediately ran out the back door.  Evidence of flight can support an inference
of guilt.  See Burks v. State, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994);
Robinson v. State, 236 S.W.3d 260, 267 (Tex. App.—Houston [1st Dist.]
2007, pet. ref’d).

Arechiga testified that appellant arrived at their
trailer with his shirt wrapped around his hand.  Appellant rushed her to leave
the trailer with him in the car he had rented.  Once in the car, Arechiga noticed
that appellant had a cut on his finger.  Arechiga described appellant’s driving
as “crazy” and “out of control.”  According to Arechiga, appellant was “[o]ut
of control” and “sweating and just panicking.”  Appellant told her that he had
been in a fight with Ramirez’s boyfriend.  Although appellant refused to tell
Arechiga what had happened, she “knew it was something bad.”  Appellant “kept
on saying, ‘What have I done, what have I done.’”  Arechiga also testified that
appellant called her later to tell her “[t]hat he was sorry and that he didn’t
mean to do whatever he did.”

Robertson testified that appellant had called her
between 2:30 and 3:00 a.m. on April 23, 2008.  When the State questioned Robertson
whether she had testified before the grand jury that appellant had told her,
“I’ve been bad, Mama” or “I did something bad,”  Robertson responded that she
could not remember and that “it was something to that effect.”  Dr. Mambo
testified that the complainant was a healthy individual who died from a stab
wound.  According to Dr. Mambo, the complainant’s stab wound was caused by a knife,
knife-like object, or sharp object.

The jury heard that the complainant was not bleeding
and had no wounds before the fight with appellant.  After the fight, appellant was
bleeding and died from a stab wound.  Appellant fled the scene and only came
back shortly to retrieve something from the living room floor.  Even though the
complainant’s blood was not found on any of appellant’s clothing, the jury was
free to conclude that, because appellant was arrested nearly two weeks after
the stabbing, he had plenty of time to dispose of the clothing he was wearing
at the time of the stabbing.  The jury also could consider that appellant was
driving a rental car and not his own truck at the time of the stabbing. 
Further, the jury was free to believe that the cut on appellant’s finger was
not caused by a fist fight but by the same sharp object used to stab the
complainant.  Contrary to appellant’s assertion that there is no evidence that
appellant “even possessed an object to stab [the complainant],” Santoya
testified that appellant “always carried a knife with him.”

Citing Pickering v. State, 596 S.W.2d 124, 128
(Tex. Crim. App. 1980), appellant incorrectly asserts that “[a] conviction
based on circumstantial evidence cannot be sustained if the circumstances do
not exclude every other reasonable hypothesis except that of guilt of the
defendant.”  This requirement followed by the court in Pickering was
rejected by the Court of Criminal Appeals in Geesa v. State, 820 S.W.2d
154, 158 (Tex. Crim. App. 1991), overruled on other grounds by Paulson v.
State, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000).  See Scillitani v.
State, 297 S.W.3d 498, 500 n.1 (Tex. App.—Houston [14th Dist.] 2009), rev’d
on other grounds 315 S.W.3d 542 (Tex. Crim. App. 2010).  As we have stated
above, “[c]ircumstantial evidence is as probative as direct evidence in
establishing guilt of the actor, and circumstantial evidence alone can be sufficient
to establish guilt.”  Hooper, 214 S.W.3d at 13.

Viewed in the light most favorable to the verdict, we
find the combined force of the incriminating circumstances allowed the jury
rationally to conclude, beyond a reasonable doubt, that appellant caused the
complainant’s death by stabbing him with a knife-like or sharp object.  See
Hooper, 214 S.W.3d at 13; see also Spiller v. State, No.
01-10-00399-CR, 2011 WL 1435075, at *3-4 (Tex. App.—Houston [1st Dist.] Apr.
14, 2011, no pet. h.) (evidence sufficient to find appellant possessed or used
a deadly weapon to stab complainant when witnesses saw appellant chase
complainant around a corner; appellant and complainant were momentarily alone;
appellant fled the scene; witnesses found complainant’s body; appellant was the
only person to leave the area during the short span of time in which
complainant was killed; no weapon was found on the scene; appellant was
arrested a few hours after the stabbing; and blood on appellant’s clothes and
car door linked appellant to complainant).  The evidence supporting appellant’s
guilt is sufficient in this case.

Accordingly, we overrule appellant’s two issues
presented on appeal.

Conclusion

We affirm the judgment of the trial court.








                                                                                    

                                                                        /s/        William
J. Boyce

                                                                                    Justice

 

 

 

Panel consists of Justices Brown,
Boyce, and Jamison.

Do
Not Publish — Tex. R. App. P. 47.2(b).

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 









[1]
Tex. Penal Code Ann. § 19.02 (b) (Vernon 2003).