**Opinion issued August 29, 2013**



In The

# Court of Appeals

For The

# First District of Texas

### NO. 01-11-00820-CR

**GIFFORD JOHNSON, III, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 10CR0548**

## MEMORANDUM OPINION

A jury convicted Gifford Johnson, III of Teresa (Teri) Wright's murder and the trial court assessed his punishment, enhanced by a prior felony conviction, at life imprisonment. Appellant argues on appeal that the evidence supporting his conviction is legally insufficient, factually insufficient, and that the trial court's

denial of his motion for a mistrial following the State's comment on his post-arrest silence was error.

Finding no error in the trial court's judgment, we affirm.

## Background

### a. Mardi Gras

On the Saturday preceding Mardi Gras in 2010, Teri picked up appellant, her fiancé, at his parents' home in La Marque and drove to Galveston where they met friends at her sister Shannon's home for a pre-party before driving to The Galveston Strand to enjoy the Mardi Gras festivities. Shannon's boyfriend, Kevin Maxiey, drove Shannon, Tracee Weatherspoon, appellant, and Teri to the Strand around 9 p.m. Cynthia Rich, Cassie Onyewuchi, and Willie and Cassandra Green, Kevin's brother and sister-in-law, drove in a second car, and Ashley Valdez and two other people followed in a third car.

The group arrived in time to catch part of the Mardi Gras parade and spent most of the evening walking around, drinking, and catching beads. While there, they met Cynthia Rich's son, Leslie Johnson, and other friends and family members. The men in the group started a betting pool to see who could catch the most beads.

Several people in the group testified that appellant appeared intoxicated. In fact, except for Teri and Cassie, almost everyone in the group was drinking. Teri

rarely drank and had, at most, a few sips of alcohol that night. Although some described the overall mood of the group as happy, others pointed out that Teri was uncharacteristically quiet and more withdrawn than usual.

Others testified that appellant, too, was upset or unhappy at times that evening. In fact, appellant told Willie that he was upset with Teri because she was not flashing her breasts for beads like some of the other women in their group, and he told Willie that he wanted to "choke the shit out of that ho." Willie's wife Cassandra, who was standing only a few feet away, heard appellant make the choking threat—"This bitch is gonna make me choke the shit out of her." When she confronted appellant about his threat, he told her that he was "just playing." Ashley, too, overheard appellant tell Teri that he was "going to choke the shit out of her because she wouldn't flash." According to Ashley, appellant wanted Teri to "help him get more beads so he could win the money or something."

On another occasion that evening, appellant grabbed the back of Teri's shirt and pulled her aside. When Teri caught up with the group about five minutes later, her face was red and she looked "real scared." Teri told Cynthia that appellant had choked her because "she wasn't paying any attention to him." Cynthia thereafter told Willie, Cassandra, Kevin, and Shannon of the incident. Teri also told her friend Tracee that appellant had grasped her neck.

Around 1 a.m., Kevin drove Shannon, Tracee, appellant, and Teri back to Shannon's home. Within minutes after arriving, Teri, whom Kevin described as unhappy, drove off in her car, with appellant in the passenger seat. Arriving at Shannon's just as Teri and appellant were leaving, Ashley noted that Teri was still not acting like herself, since normally Teri would have gotten out of the car and hugged Ashley before she left. This time, she just left. Ashley was the last person to testify to seeing Teri alive.

A little over an hour later, Teri's neighbor Rodney Stoll spotted Teri's car in the drainage ditch in front of her home as he drove past her home about 2:15-2:20 a.m. Stoll also saw a man digging around in the trunk of the car, but he was never able to identify him as it was dark and the man wore a white hoodie that hid his face.

### b. Discovery of Teri's Body

When Teri's daughter, Brittany, awoke around 10:30 Sunday morning and opened the door to the garage/laundry room a few minutes before 11 a.m., she discovered her mother's lifeless body leaning against the door on the other side. Teri's car was parked inside the garage and the garage door was shut. Brittany immediately called 9-1-1, and, at the dispatcher's request, Brittany and her sister Tarren checked to see if Teri was breathing. She was not—their mother was cold and blue.

4

Fire department personnel arrived within minutes and the paramedic who initially examined Teri's body noted that rigor mortis had already set in and, based upon the condition of her body, he suspected that she had been asphyxiated. Given the suspicious circumstances surrounding Teri's death, the police were called in and a homicide investigation commenced.

Shannon, who had been called by the emergency dispatcher, arrived at Teri's home around 11:20 a.m., and Shannon's boyfriend Kevin arrived soon afterwards. Within an hour of arriving at Teri's home, Kevin learned from Shannon that Teri had been choked. Keving testified as trial, "I don't know if [Shannon] talked to [the police] or somebody or not, but she told me, 'She's been choked.'"

### c. Appellant Disappears

As word of her death spread, more of Teri's other family members and friends came to her home and congregated on her front lawn for hours, talking and consoling one another. Most of the people who had gone to Mardi Gras with Teri the night before came to Teri's home the day her body was discovered— Valentine's Day. Conspicuously absent was Teri's fiancé, appellant. Although appellant and Teri normally exchanged dozens of text messages when they were apart, phone records indicate that appellant made no attempts to contact Teri after February 13th.

5

Some of Teri's family members and friends began to suspect that appellant was responsible for her death. Shannon, who was described as hysterical at times, allegedly told Ashley on the phone that appellant had killed her Teri. Shannon did not remember seeing Ashley at Teri's residence on Sunday nor did she remember telling Ashley that appellant had choked her sister.

Around 1:00 p.m. that afternoon, an anonymous caller contacted appellant's aunt, Linda Cole-Fort, and informed her that Teri had been strangled and that appellant was being accused of the crime. Linda informed her sister Ora Johnson, appellant's mother. Ora told her daughter, appellant's sister, Meisha Johnson, and other friends and family members.

Ora and Linda attempted to contact appellant, but neither was able to speak with him. Appellant's mother testified that she called his cell phone and left voicemail messages for him every day between February 14th and February 19th, but never heard back from him. She also enlisted the help of at least six friends and family members, but none were able to reach appellant. No one heard from appellant until Tuesday, February 16th.

On February 16th, appellant called his sister, Meisha, and asked her to wire one hundred dollars to a "Robert Long" via a Wal-Mart in Louisiana. Appellant's phone records indicate that he and Meisha exchanged eleven phone calls that day, including one that lasted for seven minutes and another that lasted for five minutes.

Appellant also reached out to a childhood friend, John Henry Jones, III, on February 16th. During their seventy-one minute phone call, appellant told John Henry that he had been in Louisiana and had been thinking about jumping in front of an 18-wheeler. Appellant, who was low on gas and needed money, told his friend that he just "wanted to end it." John Henry invited appellant to his apartment in Houston.

On Wednesday, February 17th, appellant's employer terminated his employment because he had missed several days of work and the police had told them that they were looking for him and that he would not be coming back to work. When appellant tried to pick up his paycheck on February 19th, his employer contacted the police. Appellant left abruptly, leaving his identification behind.

Later that same day, law enforcement officers spotted appellant walking to his car near John Henry's apartment in Houston, at which point, Deputy U.S. Marshal Richard Baker, and other members of the Gulf Coast Violent Offenders and Fugitive Task Force moved in to apprehend him. According to Baker, appellant ignored his command to get down on the ground and instead, started walking towards Baker, saying, "Just go ahead and shoot me. Get it over with. Just kill me." After scuffling with Baker, appellant attempted to escape on foot,

7

but he was quickly caught and arrested. Among other items, the police found a white hooded shirt in appellant's car when he was arrested.

### d. Physical Evidence Collected at Scene

The medical examiner determined that Teri had been manually strangled between 1:30 a.m. and 5:30 a.m. When the police tested Teri's left and right fingernail clippings, they detected the presence of blood. The DNA profile from the clippings was consistent with Teri's DNA profile and Teri could not be excluded as the contributor. Appellant, however, was excluded as the contributor. The police also submitted multiple swabs from the passenger compartment of Teri's car, the interior and exterior of the car's trunk, and various other pieces of evidence found at the scene, including a pair of appellant's work gloves. No DNA was found on the swabs from Teri's neck, the trunk release, or the trunk deck. Appellant's DNA, however, was found on both the steering wheel of Teri's car and the gloves. The gloves and the gear shift of Teri's car also contained DNA from an unknown person.

## Sufficiency of the Evidence

In his first and second issues, appellant contends that the evidence is legally and factually insufficient to support his conviction. In particular, he argues that the State's case was mainly based upon circumstantial evidence and the notion that appellant's unknown whereabouts after the murder was the result of a

consciousness of guilt. He further contends that the jury's finding of guilt was based upon mere speculation and the impermissible stacking of inferences.

Appellant argues that there is no direct evidence linking him to Teri's murder, and he criticizes the Texas City Police Department's failure to test what he characterizes as potentially exculpatory evidence in this case for DNA (e.g., the plastic cup in the cup holder of Teri's car, the garage door remote and wall unit, and the door knobs leading from the garage to the outside). Appellant theorizes that Teri could have encountered her killer after she dropped him off at his parents' home that night and that the killer—who Stoll saw looking in the trunk of Teri's car while the car was in the drainage ditch—had to have driven Teri's car into the garage and closed the garage door before leaving the property. Appellant also criticizes the department's failure to request cell phone tower information when it requested his cell phone records. That tower information, appellant contends, could have shown his location at the time of the murder, or shortly thereafter.

Appellant further contends that Stoll's description of the clothes worn by the man he saw standing by Teri's car at 2:15-2:20 in the morning did not match the clothes appellant wore to Mardi Gras or the clothes found in his car when he was arrested.

### a. Standard of Review

This Court reviews sufficiency-of-the-evidence challenges applying the

9

same standard of review, regardless of whether an appellant presents the challenge as a legal or a factual sufficiency challenge. *See Ervin v. State*, 331 S.W.3d 49, 53–54 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (construing majority holding of *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010)). This standard of review is that enunciated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). *See Ervin*, 331 S.W.3d at 54. Under this standard, evidence is insufficient if, considering all the record evidence in the light most favorable to the verdict, no rational fact-finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *In re Winship*, 397 U.S. 358, 361, 90 S.Ct. 1068, 1071 (1970); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We can hold evidence to be insufficient under the *Jackson* standard in two circumstances: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *See Jackson*, 443 U.S. at 314, 318 & n.11, 320, 99 S.Ct. at 2786, 2788–89 & n.11; *see also Laster*, 275 S.W.3d at 518; *Williams*, 235 S.W.3d at 750.

The sufficiency-of-the-evidence standard imbues the fact-finder with the responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443

U.S. at 319, 99 S.Ct. at 2789; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court presumes that the fact-finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793. As the exclusive judge of the facts, the jury may believe or disbelieve all or any part of a witness's testimony. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). The jury, which hears testimony from the witnesses, is in the best position to weigh the evidence, and on appeal the court will defer to the jury's assessment of credibility under these circumstances. *See Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997).

In viewing the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778. Finally, the "cumulative force" of all the circumstantial evidence can be sufficient for a jury to find the accused guilty beyond a reasonable doubt. *See Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

The Texas Court of Criminal Appeals has recognized that inference stacking, i.e., the drawing of a series of multiple reasonable inferences based on direct or circumstantial evidence, can be a proper reasoning process. *See Hooper*

*v. State*, 214 S.W.3d 9, 15–17 (Tex. Crim. App. 2007). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them," whereas "[s]peculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* at 16. "A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.* As the court of criminal appeals explained, "[r]ather than using the language of inference stacking, courts of appeals should . . . determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all evidence when viewed in the light most favorable to the verdict." *Id.* at 15–17 (citing *Jackson*, 443 U.S. at 318–19, 99 S.Ct. at 2789).

### b. Applicable Law

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02 (West Supp. 2011).

Texas courts have long held that criminal acts designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense at issue are admissible to show a defendant's "consciousness of guilt." *See Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1994). In particular, both evidence of

flight and evidence of using a false identity have been held admissible to show a defendant's consciousness of guilt for the charged offense. *See Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) (en banc) (stating that evidence of flight "shows a consciousness of guilt of the crime for which the defendant is on trial"); *Robinson v. State*, 236 S.W.3d 260, 267 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (discussing flight and use of an assumed name). Evidence of a defendant's desire to die or commit suicide is also admissible for this purpose. *See Johnson v. State*, 208 S.W.3d 478, 500 (Tex. App.—Austin 2006, pet. ref'd) (holding evidence of defendant's suicide plans relevant to show defendant's consciousness of guilt).

### c. Analysis

The evidence of appellant's guilt in this case is primarily circumstantial. Aside from the fact that appellant's DNA was found inside Teri's car and on a pair of appellant's work gloves that were recovered at the scene, there is no direct evidence linking him to Teri's murder. The fact that the evidence is circumstantial, however, does not mean that it is not sufficient to support appellant's conviction. *See Clayton*, 235 S.W.3d at 778 (circumstantial evidence alone can be sufficient to establish guilt).

In this case, several witnesses testified that they heard appellant threaten to choke Teri only hours before her death by manual strangulation. Two others

13

testified that a visibly distraught Teri told them that appellant had just choked her with his hand while they were at Mardi Gras. The jury was in the best position to weigh the evidence and assess the credibility of the witnesses. As the sole fact-finder, the jury was within its province to believe that appellant not only threatened to choke Teri, but also assaulted her by putting his hand on her throat, only hours before her death. *See Cain*, 958 S.W.2d at 408–09; *Chambers*, 805 S.W.2d at 461.

The jury was also aware of the police department's failure to test certain items at Teri's home for DNA and its failure to obtain the cell tower information when it obtained appellant's cell phone records. These omissions, however, do not render the evidence supporting appellant's conviction insufficient. They are simply additional facts for the jury to have considered when evaluating the weight of the evidence. Any alleged discrepancy between Stoll's descriptions of the man standing beside Teri's car in the early morning hours of February 14th and appellant's clothing also fell within the province of the jury to weigh and evaluate.

Evidence that appellant left the state within days of Teri's death and used a fake name to collect money wired to him by his sister, as well as his statements to John Henry that he wanted to commit suicide and his statement that the arresting officer should shoot him (i.e., "get it over with," "just kill me") are all relevant and admissible to show appellant's consciousness of guilt for the charged offense. *See*

14

*Bigby*, 892 S.W.2d at 884 (flight); *Robinson*, 236 S.W.3d at 267 (flight and use of assumed name); *Johnson*, 208 S.W.3d at 500 (suicide plans). Appellant acknowledges that he left the state shortly after his fiancée was found dead, but argues that fact alone is inconclusive of guilt, particularly in light of the fact that there is no evidence in the record that he knew that he was charged, or even wanted for questioning, in her death.

Here, appellant's mother and aunt knew that Teri was dead and that rumors were already circulating that appellant was responsible for her death by 1:30 p.m. on February 14th. Both women tried to contact him but neither spoke with him prior to his arrest. Appellant's mother testified that she called his cell phone and left voicemail messages for him every day between February 14th and February 19th. Appellant's sister, Meisha, also knew that he was being accused of Teri's murder on February 14th. Appellant called Meisha two days later—February 16th—and asked her to wire one hundred dollars to him in Louisiana, using the name "Robert Long." Appellant and Meisha exchanged eleven phone calls that day, including one that lasted for seven minutes and another that lasted for five minutes. The jury could have reasonably inferred from this evidence that appellant knew that he was a suspect in Teri's death, perhaps as early as February 14th, and certainly by the 16th when he spoke with his sister. *See Jackson*, 443 U.S. at 319,

15

99 S.Ct. at 2789 (stating province of jury to draw reasonable inferences from basic facts to ultimate facts); *Clayton*, 235 S.W.3d at 778 (same).

The combined and cumulative force of all of the evidence, when viewed in the light most favorable to the verdict, demonstrates that a rational jury could have found that each essential element of the charged offense was proven beyond a reasonable doubt.

We overrule appellant's first and second issues.

**Denial of Motion for Mistrial**

In his third issue, appellant contends that the trial court erred in denying his motion for a mistrial after the State commented on his post-arrest silence.

During its case-in-chief, the State asked one of the detectives:

Q. And following his arrest on February 19th, 2010, did you or Captain Goetschius ask Mr. Johnson if he wanted to give a statement?

A. Yes, sir.

Q. Okay. Did he give a statement?

At that point, defense counsel objected to the State's attempt to elicit testimony regarding appellant's constitutionally protected post-arrest silence. The trial court sustained the objection but denied appellant's motion for a mistrial. The trial court then instructed the jury to "disregard the last two questions from the prosecutor and any answers to those questions." Appellant argues that the trial court abused its

16

discretion when it denied his request for a mistrial because the curative instruction was insufficient to remove the taint from the minds of the jurors that appellant's failure to provide a statement should be held against him because appellant was the last documented person seen with Teri before her death.

A mistrial is an extreme remedy for prejudicial effects occurring during the trial process. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). A trial court's denial of a motion for mistrial is upheld in the absence of an abuse of discretion. *Id.* Provided that the trial court's ruling was within the zone of reasonable disagreement, the appellate court will not intercede. If we determine that the trial court erred, however, we must reverse its judgment unless we determine beyond a reasonable doubt that the error did not contribute to the defendant's conviction. TEX. R. APP. P. 44.2(a). We consider the following factors in determining whether the trial court abused its discretion by denying a motion for a mistrial: (1) the severity of the misconduct, (2) curative measures, and (3) the certainty of punishment assessed absent the misconduct. *Hawkins*, 135 S.W.3d at 77.

The use of a defendant's post-arrest silence is akin to a comment on his failure to testify at trial because it attempts to raise an inference of guilt arising from the invocation of a constitutional right, and therefore violates the Fifth Amendment prohibition against self-incrimination. *Dinkins v. State*, 894 S.W.2d

330, 356 (Tex. Crim. App. 1995). An instruction to disregard an improper comment on a defendant's post-arrest silence is generally sufficient to cure any harm, however, *see id.* at 356, and will be presumed effective unless the facts of the case suggest the impossibility of removing the impression produced on the minds of the jury. *See Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988). The effectiveness of a curative instruction is determined on a case-by-case basis. *See Veteto v. State*, 8 S.W.3d 805, 811 (Tex. App.—Waco 2000, pet. ref'd). Although not specifically adopted as definitive or exhaustive, the courts have looked to several factors to determine whether an instruction to disregard cured the prejudicial effect: (1) the nature of the error; (2) the persistence of the prosecution in committing the error; (3) the flagrancy of the violation; (4) the particular instruction given; (5) the weight of the incriminating evidence; and (6) the harm to the accused as measured by the severity of sentence. *Waldo*, 746 S.W.2d at 754.

Although the nature of the constitutional right affected was serious, its prejudicial effect is limited for several reasons. The detective never answered the question about whether appellant gave a statement to police. The State did not persist in questioning the detective about appellant's silence or mention it during closing argument. *Id.* The trial court timely instructed the jury to "disregard the

18

last two questions from the prosecutor and any answers to those questions."[1] *Id.* Finally, the improper question did not change the outcome of the case in light of all of the evidence supporting appellant's conviction. *Id.*

Given that the instruction to disregard was sufficient to remove the impression produced on the minds of the jury, and the State's misconduct was not pervasive or flagrant, we cannot say that the trial court abused its discretion when it denied appellant's request for a mistrial. *See Hawkins*, 135 S.W.3d at 77.

We overrule appellant's third issue.

### Conclusion

We affirm the trial court's judgment.

Jim Sharp
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).

---

[1] Appellant contends that the instruction to disregard that was given was "too weak" to remove the impression produced on the minds of the jury by the inadmissible testimony. We disagree. The Court of Criminal Appeals has held that a similar instruction given in another case in which the State elicited testimony regarding a defendant's post-arrest, post-Miranda silence was adequate. *See Waldo v. State*, 746 S.W.2d 750, 755–56 (Tex. Crim. App. 1988) ("Jury is instructed to disregard the last comment of the witness."). *But compare Veteto v. State*, 8 S.W.3d 805, 811–12 (Tex. App.—Waco 2000, pet. ref'd) ("You'll disregard," found to be inadequate instruction).

19