Opinion issued February 15, 2007

 










In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00622-CR






JEREMY STEVEN ROBINSON, Appellant


V.


THE STATE OF TEXAS, Appellee

__________________________________________________________________


On Appeal from the 228th District Court

Harris County, Texas

Trial Court Cause No. 984059

__________________________________________________________________


O P I N I O N


 A jury convicted appellant, Jeremy Steven Robinson, of felony murder and 
assessed punishment at life in prison and a fine of $10,000. See Tex. Pen. Code
Ann. § 19.02(b)(3) (Vernon 2003). We determine whether the State had to prove that
the alleged complainant, a firefighter dispatched to the scene, was an occupant of the
building at the time that appellant set the fire and whether the trial court erred in
admitting evidence of extraneous offenses. We affirm.

Background

 Appellant, James Guevara, and Brian Weiner knew each other through the
fraudulent-check crime ring, run by appellant, in which they participated. Appellant's
girlfriend, Patricia Praker, also participated in the crime ring from time to time. 
Guevara was married to Ada Ruiz, but they had separated and had begun having a
child-custody dispute. At the time, Ruiz worked with her mother, brother, and sister
at the El Festival Ballroom, an after-hours club in Northwest Houston. On April 1,
after Guevara had failed timely to return their daughter to Ruiz after a visitation, Ruiz
filed for divorce. 

 After Ruiz had filed for divorce, appellant called Ruiz on her cell phone and
warned her to be careful because "someone she loves or cares about could get hurt." 
In response, Ruiz sent a text message to a friend to pass along to appellant. The
message was in Spanish, and it translated roughly as "we all got skeletons in our
closet" or "everybody has a tail that can be stepped on." Ruiz said that she meant that
"if appellant did anything against her, she would tell everything she knew" about his
illegal activities. Around the same time, appellant also called Ruiz's boyfriend,
Miguel Flores, and mentioned the names and addresses of his parents. Flores took
this as a threat. However, neither Ruiz nor Flores immediately contacted the police. 
At some point, appellant, Praker, and Guevara discussed burning down the El Festival
Ballroom in order to deprive Ruiz of a job and to help Guevara get custody of his
daughter.

 Around 3:30 a.m. on Sunday, April 4, 2004, Weiner called appellant asking if
he knew where to get some liquor. Appellant called Weiner back about 10 minutes
later and told him to come to a Taco Cabana at 290 and Tidwell. Then Guevara
called appellant on his cell phone and asked appellant to meet him at Wal-Mart, but
when appellant and Praker arrived, Guevara was not there. Praker and appellant went
inside Wal-Mart and purchased gas cans and black t-shirts. Appellant and Praker
decided to meet Weiner and Guevara at a nearby Taco Cabana. Appellant and Praker
were riding in a Jeep Grand Cherokee Laredo leased in Guevara's name, and Weiner
and Guevara arrived in Weiner's Mazda RX-7. 

 Appellant and Praker then followed Weiner and Guevara to a nearby Citgo gas
station, where they were caught on videotape and later identified by an attendant as
the ones who filled the gas cans with $60 worth of gas. Then Praker got out of the
Jeep and into the passenger side of Weiner's car. Weiner rode in the Jeep, with
appellant driving. Appellant told Weiner that they were going to the El Festival
Ballroom to threaten the opponent of a friend in a child-custody case so that the
opponent would not show up in court. Weiner and appellant put on the dark t-shirts
that had been purchased at Wal-Mart. 

 In the early morning hours of April 4, 2004, Ruiz was at work at the El Festival
Ballroom. Her mother, brother, and sister were also working there that night. The
club usually opened about 4:00 p.m. and closed about 7:00 a.m. Around 3:00 a.m.
that morning, Guevara called Ruiz and argued with her about the divorce and custody
of their daughter. Ruiz had told Guevara that she was at work, and Guevara knew
that Ruiz worked at El Festival Ballroom. 

 About 5:00 a.m., Praker and Guevara drove to the Jack-in-the-Box across the
street from the El Festival Ballroom, while appellant and Weiner drove to the El
Festival Ballroom. Appellant and Weiner drove to the rear of the building and got out
of the car. Appellant boosted Weiner over a fence and handed the gas cans over the
fence to Weiner. Praker and Guevara were parked in the Jack-in-the-Box lot, facing
El Festival Ballroom serving as lookouts. They noticed cars in the El Festival
Ballroom parking lot and assumed that there were a number of people inside the club. 
After Weiner had spread gasoline along the back of the building, appellant made a
trail of gasoline from the side of the building to the middle of the parking lot. 
Appellant lit the gasoline trail on fire as he and Weiner drove away. Weiner and
appellant parked in the El Festival Ballroom parking lot, and appellant got out of the
car with his gun to "end it now" and to shoot their intended victim, Ruiz. However,
Weiner begged him to get back in the car. 

 Meanwhile, Ruiz went to the restroom and noticed a strong odor of gasoline. 
At the time, there were approximately 50 customers in the club, but they soon
complained of the gasoline odor and began to leave. Ruiz went outside to try to
determine from what location the smell was coming, and she saw that the back of the
building and a truck in the parking lot were on fire. The inside of the club was not
yet smoky. She called 9-1-1 and reported that the building was on fire. Ruiz ran
back inside and told people to get out because the building was on fire.

 Meanwhile, appellant and Weiner met up with Praker and Guevara at the Taco
Cabana where they had been before. Weiner got in his car and went home, but
appellant, Praker, and Guevara returned to the club, which was now engulfed in
flames, to watch the firefighters battle the blaze. Guevara took pictures on a digital
camera.

 In response to Ruiz's 9-1-1 call reporting a fire, firemen from Station 50 of the
Houston Fire Department arrived and heard customers standing outside say that there
were still people inside. Captain James Walterbach decided to do a "fast attack," in
which he and two other firefighters would enter the building and attempt to
extinguish the fire and to rescue people who might be trapped inside. Thus, Captain
Walterbach, Larry Roberts, and Kevin Kulow entered the building. The interior was
dark and smoky, and there was no visibility. The fire hose got tangled on something
inside, and the firefighters had to exit. The three firemen entered the building a
second time and shot water on different areas to cut down on the smoke and to cool
off the building. Captain Walterbach heard on his radio that the fire had vented
through the roof, and he considered this unusual. He ordered his men out, but his air
regulator malfunctioned, and he passed out immediately afterward. Kulow got
separated from the others and was left inside. Roberts made it out. Another
firefighter, Abel Sarabia, rescued Captain Walterbach, but could not find Kulow. As
soon as Sarabia got out, the building experienced a flashover, which is the point at
which everything inside reaches "ignition point" at the same time. At that point, it
was impossible to rescue anyone inside. The firefighters could not re-enter the
building, and Kulow remained missing. When the fire was under control, firefighters
re-entered the building and found Kulow's body; he had died from burning and not
from smoke inhalation. Arson investigators determined that 47 samples of debris
taken from the scene of the fire all tested positive for gasoline, which indicated a case
of arson.


 Later that same day, appellant, Praker, and Guevara met at the home of
Guevara's sister, and they learned for the first time from the television news that a
fireman had died in the fire. On April 4 and April 6, police interviewed Guevara, and
from those interviews they developed Praker, Weiner, and appellant as suspects. The
police eventually arrested Guevara.

 Appellant, Praker, and Weiner decided to flee to Dallas after seeing their
pictures on the news. Weiner stole a green Acura Integra and switched the plates
with those of another Integra. He rented a U-Haul truck under a different name and
had his girlfriend drive him to his father's house to borrow money. Weiner and
appellant loaded a computer, card printer, and other equipment into the U-Haul. On
the way up to Dallas, Weiner drove the U-Haul, and appellant, Praker, and their two
children rode in the Integra. They stopped at a Wal-Mart in order to buy walkie-talkies so that they could communicate between cars.

 When they arrived in Dallas, appellant, Praker, their two children, and Weiner
checked into a Ramada Inn under assumed names. They had adjoining rooms, with
appellant, Praker, and their children in one, and Weiner in the other with the card
machine and other counterfeiting equipment. The police traced phone calls from
appellant's phone to an apartment complex in Dallas. They also had reports that
appellant, Praker, and Weiner were driving a U-Haul and a stolen green Integra. The
police narrowed their search to the downtown Dallas area. During the search, one of
the police officers saw a Ramada Inn hotel that had not yet been searched. The police
pulled into that hotel's parking lot and saw a U-Haul. The police asked the hotel
manager in whose names the room rented by the U-Haul's occupants was registered. 
The names of the room's occupants were not those of appellant or his two traveling
companions, but a physical description that the hotel manager gave of the room's two
occupants matched that of Robinson and Weiner. The hotel's registration card for
that room showed that a green Acura was also registered to that room's occupants. 

 As appellant and Weiner were walking across the hotel parking lot at 4:00 a.m
on April 11, after having attempted to steal another car, police arrested Weiner, but
appellant escaped. That same morning, police entered the hotel rooms where
appellant, Weiner, and Praker had been staying. There police arrested Praker. There
they also found the card machine and counterfeiting equipment, as well as a gun and
ammunition. After Praker's arrest, her family in Houston received a phone call from
appellant threatening to kill Praker if they did not send money. Her family reported
the call to police, and they traced it to a Kroger in Dallas, where appellant was
arrested.

 At trial, the State presented testimony from firefighters, arson investigators,
employees of the club, and appellant's accomplices, Praker and Weiner. Guevara
refused to testify and was held in contempt. 

Challenge to Meaning of Particular Language in Indictment

 In his first point of error, appellant challenges the legal sufficiency of the
evidence. Appellant argues that because the indictment alleged and the jury charge
required the jury to find that appellant set fire to an occupied building, thereby
causing Kulow's death, the State had the burden to prove Kulow was in the building
when the building was set on fire. Indeed, appellant claims that "any reasonable
person reading the words 'by setting an occupied building on fire and did thereby
cause the death of Kevin Kulow' would assume that Kulow died because he was an
occupant of the building when it was set on fire." Thus appellant's challenge,
although labeled a legal sufficiency-challenge, is really a challenge concerning the
meaning of the phrase "by setting an occupied building on fire and did thereby cause
the death of Kevin Kulow." 

 We decline to apply a legal-sufficiency standard of review to what is really an
argument concerning the meaning of a particular phrase in the indictment. See
Cathey v. State, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999) (declining to
impose legal-sufficiency standard of review when real issue in question was review
of accomplice-witness testimony). In the instant case, the court need only determine
the meaning of the phrase in question because this determination is dispositive of the
legal-sufficiency challenge. If appellant's challenge is correct, and the State was
required to prove that Kulow was in the building when the fire was set, then it is clear
that the facts were not sufficient to show guilt. If, however, the wording of the
indictment did not require the State to show that Kulow was in the building at the
time that the fire was set, but instead allowed the State to show merely that the
building was occupied by someone when the fire was set and that Kulow's death
resulted from the setting of the fire, then it is clear that the evidence would be legally
sufficient to show guilt.

 At the outset, it might be tempting to assume that, if one caused the death of
someone by setting on fire an occupied building, the death would most likely have
been caused to an occupant of the building. Nevertheless, in a case from this Court,
a defendant's conviction for felony murder of non-occupants of a building was upheld
based on the defendant's having set fire to the building. Torres v. State, Nos. 01-01-00999-CR & 01-01-01000-CR, 2002 WL 31838694, at *3-5 (Tex. App.--Houston
[1st Dist.] 2002, pet. ref'd) (not designated for publication). The argument that we
rejected in Torres was that starting a fire in an empty, freestanding building is not
dangerous to human life. Id. at *3-5. In Torres, two firefighters lost their lives
fighting a fire set by the defendant as he was leaving an unoccupied restaurant. Id.
at *2. 

 It has long been the law that one who commits arson may be found guilty of the
murder of a person who died inside the house or by fighting the fire, even though the
arsonist did not intend to cause any personal injury by his act. See Murphy v. State,
665 S.W.2d 116, 119 (Tex. Crim. App. 1983); see also Lawson v. State, 64 S.W.3d
396, 397 (Tex. Crim. App. 2001) (Cochran, J., concurring). The basis for these
decisions is that burning a building within a city often produces certain dangerous
consequences, such as (1) firefighters' (or good samaritans') responding to try to save
any occupants and to extinguish the fire or (2) other nearby buildings catching on fire. 
See Loredo v. State, 130 S.W.3d 275, 278 (Tex. App.--Houston [14th Dist.] 2004,
pet. ref'd); Jones v. State, 100 S.W.3d 1, 3 (Tex. App.--Tyler 2002, pet. ref'd)
(upholding conviction for felony murder when appellant set fire to house that he had
burglarized and fire spread and killed inhabitants of neighboring home); Torres at
*4-5. In these situations, the burning of a building "thereby causes" the death of (1)
firefighters (or good samaritans) who respond to fight the fire, whether or not they
actually enter the building and become occupants, or (2) occupants of nearby
buildings that catch on fire due to their proximity to the targeted building. See Jones,
100 S.W.3d at 3; Torres at *4-5.

 Accordingly, we reject appellant's argument that the only deaths that can be
"thereby caused" by setting fire to an occupied building are those of the occupants of
that building. Furthermore, appellant does not challenge the sufficiency of the
evidence proving that he intended to burn an occupied building and that the fire that
he started caused the death of Kulow. Thus, having rejected appellant's argument
that Kulow had to have occupied the building at the time of appellant's conduct, we
overrule appellant's first point of error.

Extraneous Offenses

 In his second through fifth points of error, appellant contends that the trial
court erred in admitting evidence of extraneous offenses at the guilt stage of trial. 
These extraneous offenses consisted of forgery of documents, automobile theft,
possession of a firearm, and attempted extortion.

A. Standard of Review

 "A trial court's ruling on the admissibility of extraneous offenses is reviewed
under an abuse of discretion standard." Prible v. State, 175 S.W.3d 724, 731 (Tex.
Crim. App. 2005). As long as the trial court's ruling is within the "zone of reasonable
disagreement," there is no abuse of discretion, and the trial court's ruling will be
upheld. Id.

B. Applicable Law

 Texas Rule of Evidence 404(b) provides:


 Evidence of other crimes, wrongs, or acts is not admissible to prove the
character of a person in order to show that he acted in conformity
therewith. It may, however, be admissible for other purposes, such as
proof of motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident, provided upon timely request
by the accused, reasonable notice is given in advance of trial of intent
to introduce in the State's case in chief such evidence other than that
arising out of the same transaction.

Tex. R. Evid. 404(b).

 In addition to the explicit exceptions set out in rule 404(b), extraneous-offense
evidence may be admissible as contextual evidence. Wyatt v. State, 23 S.W.3d 18,
25 (Tex. Crim. App. 2000). There are two types of contextual evidence: (1) evidence
of other offenses connected with the primary offense, referred to as same transaction
contextual evidence, and (2) general background evidence, referred to as background
contextual evidence. Swarb v. State, 125 S.W.3d 672, 681 (Tex. App.--Houston [1st
Dist.] 2003, pet. dism'd). Extraneous conduct may provide the jury information
essential to understanding the context and circumstances of events that are blended
or interwoven. Id. The purpose of such extraneous evidence is to put the instant
offense in context. Id. 

 Evidence of flight is also admissible as a circumstance from which an inference
of guilt can be drawn. Burks v. State, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994). 
Extraneous offenses, like the charged offense, must be proven beyond a reasonable
doubt. Haley v. State, 173 S.W.3d 510, 514 (Tex. Crim. App. 2005). 

 Before extraneous-offense evidence can be admitted, it must also satisfy the
balancing test established in Rule of Evidence 403, that is, evidence is admissible if
and only if its probative value is not substantially outweighed by its unfair prejudicial
effect. Tex. R. Evid. 403. A proper rule 403 analysis includes, but is not limited to,
the following factors: (1) the probative value of the evidence; (2) the potential to
impress the jury in some irrational, yet indelible, way; (3) the time needed to develop
the evidence, such that the attention of the fact-finder is diverted from the indicted
offense; and (4) the proponent's need for the evidence. Prible, 173 S.W.3d at 733;
Montgomery v. State, 810 S.W.2d 372, 389-90 (Tex. Crim. App. 1990) (op. on
reh'g).

C. Analysis

 1. Forgery and Fraud

 In his second point of error, appellant contends the trial court erred in admitting
evidence of his forgery of documents at the guilt stage of trial. However, he
complains only of evidence of fraudulent activity committed after the arson and
admits that admission of evidence of forgery and other fraud committed before the
arson was properly admitted to show a connection among Weiner, Guevara, and
appellant and a motive for appellant to help Guevara. 

 Both Praker and Weiner testified that, when they and appellant decided to flee
to Dallas, they loaded up computers and card-printing equipment. The prosecutor
asked what the purpose of the equipment was, and defense counsel objected on the
basis of relevance and rule 404(b). The trial court overruled the objection, and Praker
testified that they had taken the equipment in order to continue cashing fake checks
in Dallas. Defense counsel requested a running objection, and the trial court granted
it. The State argued that the evidence showed flight and an intent to remain on the
run and that using fake identification to rent a U-Haul and a hotel room reflected
consciousness of guilt. The trial court admitted the evidence and gave the jury a
limiting instruction in the jury charge, limiting the jury's consideration of the
evidence to motive or relationship of the parties. 

 We hold that the evidence was properly admitted under rule 404(b) in order to
show motive, relationship of the parties, and consciousness of guilt. See Tex. R.
Evid. 404(b); Ransom v. State, 920 S.W.2d 288, 299 (Tex. Crim. App. 1994); Burks,
876 S.W.2d at 903. Furthermore, applying the rule 403 balancing test, we hold that
the evidence is not unfairly prejudicial. The evidence was needed to show that
appellant was on the run and intended to stay on the run. The fact that appellant had
equipment to produce fake checks is unlikely to make an unfair impression on the
jury, nor does it unduly take attention away from the indicted offense. Therefore, the
probative value of the evidence tending to show that appellant was on the run and was
intending to remain on the run was not substantially outweighed by the danger of
unfair prejudice. 

 We overrule appellant's second point of error.

 2. Auto Thefts

 In his third point of error, appellant contends the trial court erred in admitting
evidence of thefts of automobiles at the guilt stage of trial. 

 a. Flight to Dallas

 At trial, Weiner testified that he had stolen a green Acura Integra and switched
license plates with another green Integra and that appellant had driven it to Dallas. 
As noted above, evidence of flight may demonstrate consciousness of guilt. See
Burks, 876 S.W.2d at 903. However, appellant argues that the State did not have to
include evidence of the automobile theft in order to show flight. 

 In this case, the automobile theft was directly related to appellant's flight and
his attempt to conceal his identity, both of which demonstrated a consciousness of
guilt. The theft of the car and the switching of the license plates were ways in which
the appellant attempted to conceal his identity and to avoid detection as he fled to
Dallas. Additionally, Special Agent Jerrard Carter, who arrested Weiner and Praker,
testified that the search for a U-Haul registered under a fake name helped them to
track down appellant at the Ramada Inn. The use of a fake name also shows
consciousness of guilt during flight from Houston. See Felder v. State, 848 S.W.2d
85, 98 (Tex. Crim. App. 1992) (holding that presentation of fake identification to
police officer in order to conceal identity was evidence of consciousness of guilt). 
Thus, the evidence of flight, along with evidence that appellant tried to hide his
identity by taking someone else's car and switching the license plates, as well as
renting a U-Haul under a fake name, was admissible to show consciousness of guilt
and was thus admissible under rule 404(b). See id.; Bradley v. State, 48 S.W.3d 437,
442 (Tex. App.--Waco 2001, pet. ref'd). 

 Applying a rule 403 balancing test, we hold that the probative value of the
evidence showing the automobile theft in Houston was not substantially outweighed
by the danger of unfair prejudice. This evidence demonstrated flight and
consciousness of guilt. It was not likely to leave any unfair or irrational impression
upon the jury and did not unduly take attention away from the charged crime.

 b. Acts in Dallas

 Appellant also complains of the admission of evidence that, when Weiner and
appellant were arrested, they were returning to the hotel from having attempted to
steal another car. We hold that the probative value of this evidence was outweighed
by the danger of unfair prejudice. The evidence of the attempted automobile theft in
Dallas was only distantly related, if at all, to the offense for which appellant was
being tried. The evidence did not tend to show flight and added nothing to a showing
of consciousness of guilt. Furthermore, the State did not need this evidence to be
admitted in order for the jury to understand that appellant was arrested while in
Dallas. Thus, we determine that this was an erroneous admission of extraneous
evidence, and we must conduct a harm analysis.

 When conducting a harm analysis, the court must first determine whether a
constitutional-harm standard or a substantial-right standard is appropriate. See
Merritt v. State, 982 S.W.2d 634, 636 (Tex. App.--Houston [1st Dist.] 1998, pet.
ref'd, untimely filed); see also Tex. R. App. P. 44.2(a), (b). Appellant argues that the
court should apply a constitutional-harm standard under Texas Rule of Appellate
Procedure 44.2(a). However, an error is constitutional only if the correct ruling was
required by the United States Constitution or the Texas Constitution. Thompson v.
State, 95 S.W.3d 537, 542 (Tex. App.--Houston [1st Dist.] 2002, no pet.); see Tex.
R. App. P. 44.2(a). Such is not the case here. The erroneous admission of an
extraneous offense does not constitute constitutional error. Avila v. State, 18 S.W.3d
736, 742 (Tex. App.--San Antonio 2000, no pet.). Thus, rule 44.2(b) applies.

 When considering a non-constitutional error, we must disregard the error
unless it affects a substantial right. Tex. R. App. P. 44.2(b). An error affects a
defendant's substantial rights only when the error had a substantial and injurious
effect or influence on the jury's verdict. King v. State, 953 S.W.2d 266, 271 (Tex.
Crim. App. 1997). If the error had only a slight influence on the verdict, the error is
harmless. Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Important
factors include the nature of the evidence supporting the verdict, the character of the
alleged error, and how the error might be considered in connection with other
evidence in the case. Bagheri v. State, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003);
Motilla v. State, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). "Specifically, the
reviewing court should consider whether the State emphasized the error, whether the
erroneously admitted evidence was cumulative, and whether it was elicited from an
expert." Motilla, 78 S.W.3d at 357. Evidence of guilt can be a factor in a harm
analysis. See id.

 Appellant fails to show that the State emphasized this error in its case. 
Weiner's testimony referred to the attempted theft in Dallas only one time. The
attempted theft was not mentioned in the State's closing argument. Furthermore, the 
evidence was not elicited from an expert. If the evidence showing that appellant was
arrested after having returned from an attempt to steal an automobile had any effect
on the jury, it was only of the slightest amount. Given all of the evidence before the
jury, it is unlikely that the admission this evidence would have had a substantial effect
on the jury's verdict. See id.

 Thus, we hold that the trial court did not abuse its discretion by admitting
evidence of the car theft in Houston and use of a fake name to rent the U-Haul, and
we further hold that the error in admitting evidence of an attempted car theft in Dallas
was harmless. We overrule appellant's third point of error.

 3. Firearm Possession

 In his fourth point of error, appellant contends that the trial court erred in
admitting evidence of possession of firearms in Dallas at the guilt stage of trial. At
trial, Special Agent Carter testified that, after having arrested Weiner and Praker, he
found a 9-millimeter round of ammunition, a .556-round of ammunition, and a .357-caliber handgun. The gun was not loaded.

 We hold that this evidence was probative because it provided the jury with
information essential to understanding the context and circumstances of the crime.
See Swarb, 125 S.W.3d at 681. The complained-of evidence supported Weiner's
testimony that he had a 9-millimeter Glock and that appellant and Guevara each had
different handguns during the commission of the offense. 

 Neither was this evidence unfairly prejudicial under a rule 403 balancing test. 
The State did not spend a large amount of time focusing on the possession of
handguns. Additionally, the possession of the handgun was not unfairly prejudicial
because mere possession of a handgun in a temporary home and while traveling is
not, in and of itself, a criminal offense or a bad act. See Tex. Pen. Code Ann. § 46.15
(Vernon 2003); Campbell v. State, 28 Tex. Ct. App. 44, 44, 11 S.W. 832, 832 (1889). 
The probative value of this evidence is not substantially outweighed by the danger of
unfair prejudice. 

 We hold that the trial court did not abuse its discretion in admitting this
evidence. We overrule appellant's fourth point of error.

 4. Attempted Extortion

 In his fifth point of error, appellant contends that the trial court erred in
admitting evidence of attempted extortion at the guilt stage of trial. 

 The trial court admitted evidence that, after Praker's arrest, appellant called
Praker's family and threatened to kill Praker if they did not wire money to him. Her
family called the Houston Police Department, which traced the phone call and
contacted Dallas police. Appellant was arrested at the Dallas Kroger store where he
had placed the call. At trial, the State argued that this evidence showed flight because
appellant needed money to stay "on the run" and also showed the circumstances
surrounding appellant's arrest. 

 The offense of attempted extortion was only distantly, if at all, related to the
offense for which appellant was being tried. It was a threat made against an
accomplice to her family. Furthermore, the State did not need this evidence to be
admitted for the jury to understand the nature of the charged offense or the
circumstances surrounding the arrest. Contextual evidence is admissible "only to the
extent that it is necessary to the jury's understanding of the offense." Wyatt, 23
S.W.3d at 25 (quoting Poindexter v. State, 942 S.W.2d 577, 584 (Tex. Crim. App.
1996)). Evidence of attempted extortion was not necessary to show that police
arrested appellant after tracing one of his phone calls. It was sufficient for the State
to prove the tracing of the phone calls without demonstrating the content of the calls. 
The danger of unfair prejudice substantially outweighs the probative value of this
evidence. We hold that the trial court abused its discretion in admitting evidence of
attempted extortion. Because of this holding, we must now conduct a harm analysis. 
See Tex. R. App. P. 44.2(b)

 The State did not emphasize the evidence of attempted extortion. Aside from
the testimony elicited from Officer Kurt Hibbets and Special Agent Carter, the
extraneous offense was not mentioned again. The prosecution did not discuss the
attempted extortion in closing arguments and instead focused on events leading up
to the fire, such as threatening phone calls and the purchase of gasoline. The officers'
testimony referred only to one instance of attempted extortion, and it was a small part
of the officers' testimony about searching for appellant in Dallas over several days. 
Furthermore, the testimony was not elicited from an expert, so as to give it greater
authority. Finally, there is no indication that the jury took a great interest in the
evidence of attempted extortion; the only items that the jury requested during its
deliberations were photographs and diagrams of the El Festival Ballroom and
physical evidence. For these reasons, we hold that the trial court's error in admitting
evidence of the extraneous offense of attempted extortion was harmless.

 Accordingly, we overrule appellant's fifth point of error.Conclusion

 We affirm the judgment of the trial court.



 

 Tim Taft

 Justice


Panel consists of Justices Taft, Keyes, and Hanks.


Justice Keyes, concurring.


Publish. See Tex. R. App. P. 47.2(b).