**Opinion issued November 20, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00505-CR

————————————

**KARL FREDERICK SCHULTZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from County Criminal Court at Law No. 1**
**Harris County, Texas**
**Trial Court Case No. 1802555**

---

## O P I N I O N

Appellant, Karl Frederick Schultz, was charged by indictment with driving while intoxicated.[1] Appellant moved to suppress the results of his breath test, and the trial court denied the motion. Appellant then pleaded guilty to the offense,

---

[1] *See* TEX. PENAL CODE ANN. § 49.04(a) (Vernon 2014).

subject to his right to appeal the ruling on the motion to suppress. The trial court found appellant guilty and assessed punishment at confinement for one year. The trial court then suspended the sentence and placed Appellant on community supervision. On appeal, Appellant argues in three issues that (1) the trial court abused its discretion by excluding certain evidence from the suppression hearing, (2) the breath test results should have been suppressed because they were obtained in violation of the law, and (3) the breath test results should have been suppressed because they were not reliable.

We affirm.

## Background

Appellant was arrested in the early morning hours of January 7, 2012 for driving while intoxicated. Appellant stipulated at the suppression hearing that reasonable suspicion existed for a detention, that probable cause justified his arrest, and that the required statutory warnings were properly given to him. The arresting officers took Appellant to a nearby gas station. Parked at the gas station was a Houston Police Department Breath Alcohol Testing van. Appellant agreed to give a breath test.

Officer D. Ciers testified at the suppression hearing. He testified that he brought appellant into the van and closed the door. It was a cool morning—about 72 degrees Fahrenheit inside the van—and the air conditioner was not running in

2

the van. Officer Ciers observed Appellant for a 15-minute period and then conducted the breath test using a machine mounted inside the van called the Intoxilyzer 5000.

Ronald Oliver, a technical supervisor for the Texas Department of Public Safety, also testified at the suppression hearing. Part of Oliver's responsibilities as a technical supervisor was to regularly inspect and calibrate the breath test machines. Oliver testified that the breath test machine used on Appellant was inspected about one week before Appellant's test. He also testified that Appellant's test was the first one after the inspection. When questioned about whether the inspections on the machines were valid when the machines were used in a mobile van, Oliver testified,

> A testing site is a testing site. Whether it has wheels or not doesn't make any difference. If the testing site is appropriate, then you can get good, valid alcohol results from that instrument. If it's in a bad location, whether it have wheels or not have wheels; that we have testing sites in jails that overheat and there are times when we can't run tests, then that physical location is it's just too hot or too cold.

Oliver also testified about the approval of the Houston Police Department's breath testing program by the Texas Department of Public Safety's scientific director. Specifically, Oliver testified,

> Q. And is [the Intoxilyzer 5000 that was used on Appellant] certified by the scientific director of the Texas Department of Public Safety?
>
> A. Yes.

3

Q.    And was it certified on the date of January 7th, 2012?

A.    That is correct.

Q.    And is that instrument used as a part of the breath test program?

A.    That is correct.

Q.    Are you responsible for the maintenance of that instrument?

A.    I was, yes.

Finally, Oliver testified at trial about the Intoxilyzer 5000's many failsafes for inaccurate breath tests.  The machine tests for the presence of alcohol, specifically ethanol.  Ethanol absorbs a specific wavelength of infrared light. When that wavelength of light is passed through the air chamber, less of the light will come out the other side of the chamber due to its absorption by the ethanol.  A measure of the decrease in the amount of the infrared light establishes the amount of ethanol present in the sample.

Other known chemicals can also absorb infrared light at the same wavelength.  These are called interferents and can potentially cause a false identification of ethanol.  To account for this, the machine also tests for five known interferents, such as acetone.  If any interferents are detected, the machine subtracts the amount of interferents detected from the total amount detected for the test wavelength.

4

Every time the machine is run, it performs a test of its internal components to ensure that the circuitry is functioning properly. If it is not functioning properly, the test ends and the report explains an error occurred.

Next, it purges the system of the air in it at the time, drawing in air from its current environment. The machine then tests that air sample. The test subject then breathes into a tube connected to the machine. The machine tests that breath sample as well. It then performs another test from the current environment. After that, the machine then tests what is known as a reference sample. The reference sample is designed to produce a result for a specific volume of alcohol. The test subject then breathes again in the tube, and the machine tests that sample as well. Another sample of the air in the current environment is tested. Finally, the machine draws another sample in from the environment and tests it again.

After the tests are complete, the machine prints out a report showing the results for each test. If any errors occur during the testing, the report explains an error occurred and does not include the testing results. Potential errors include improperly functioning circuitry, overheating, being overly cold, interferents being detected in the ambient air samples, and the two breath samples from the test subject being too far apart.

In the present case, the report did not identify any errors. It identified the alcohol concentration for the first air sample at 0.000. It identified the alcohol

concentration for Appellant's first breath sample at 0.158.[2] It identified the alcohol concentration for the second air sample at 0.000. The reference sample was predicted to identify an alcohol concentration of 0.080. The machine identified the alcohol concentration for the reference sample at 0.077. It identified the alcohol concentration for the third air sample at 0.000. It identified the alcohol concentration for Appellant's second breath sample at 0.168. Finally, it identified the alcohol concentration for the fourth air sample at 0.000.

Appellant presented the expert testimony of Raymond McMains. McMains had been a technical supervisor for the Texas Department of Public Safety for 17 years. McMains testified that he was aware of some tests where ethanol and acetone were tested in a sample together. "And a few times it did not detect that. And in one case it didn't subtract it because they used a .08 solution and it showed up a .09." McMains also testified that, based on his study of breath tests conducted throughout the state from 2007 to 2011, "the Houston [breath alcohol testing] vans were nine times more likely to detect an interferent than a nonmobile Intoxilyzer site."

After all the witnesses had testified, Appellant offered into evidence a marketing brochure from the company that makes the Intoxilyzer 5000. The

---

[2] Breath tests in Texas are a measurement of grams of alcohol per 210 liters of breath. TEX. PENAL CODE ANN. § 49.01(1)(A) (Vernon 2011).

brochure was for a machine called the Intoxilyzer 8000. There was no sponsoring witness.

## Admission of Evidence

In his second issue, Appellant argues the trial court abused its discretion by excluding a marketing brochure for another machine made by the company that makes the Intoxilyzer 5000.

### A. Standard of Review & Applicable Law

With the exception of rules concerning privileges, the Texas Rules of Evidence do not apply in a suppression hearing. TEX. R. EVID. 101(d)(1)(A), 104(a); *Granados v. State*, 85 S.W.3d 217, 227 (Tex. Crim. App. 2002). Instead, "[t]he trial judge makes a legal ruling to admit or exclude evidence based upon the relevance and reliability of the factual information submitted by the parties." *Ford v. State*, 305 S.W.3d 530, 535 (Tex. Crim. App. 2009). We afford "great deference" to the trial court's decision to admit or exclude evidence in a hearing on a motion to suppress, and we will overturn that decision on appeal only when "a flagrant abuse of discretion is shown." *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007).

### B. Analysis

After all the witnesses had testified, Appellant offered into evidence two marketing brochures from the company that makes the Intoxilyzer 5000. The first

brochure was for the Intoxilyzer 5000. The second brochure was for a machine called the Intoxilyzer 8000. The Intoxilizer 8000 brochure states that it is "fully mobile." The Intoxilizer 5000 brochure does not address its ability to be used in mobile environments.

The State had no objection to the brochure for the Intoxilizer 5000, but objected that the brochure for the Intoxilizer 8000 was not relevant. The trial court agreed and sustained the objection for the Intoxilizer 8000 brochure.

Even assuming the trial court's exclusion of the Intoxilizer 8000 brochure was error, Appellant must establish that the error was harmful. Appellant's argument for harm is contained in one sentence. "Had the trial judge considered the content of the brochures as evidence of the manufacturer's purpose and design of the different Intoxilizers, her ruling may have been different."

Even when the rules of evidence do apply, we evaluate harm in the admission or exclusion of evidence for non-constitutional error. *Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005). For non-constitutional errors, we disregard errors that do not affect the appellant's substantial rights. TEX. R. APP. P. 44.2(b); *Robinson v. State*, 236 S.W.3d 260, 269 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). An error affects a substantial right only when the error had a substantial and injurious effect or influence on the jury's verdict. *Robinson*, 236 S.W.3d at 269 (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)).

In contrast, "if we are fairly assured that the error did not influence the jury or had but a slight effect, we conclude that the error was harmless." *Ray*, 178 S.W.3d at 836.

The only relevance that can be attributed to the Intoxilizer 8000 brochure is to show that the machine has been advertised as "fully mobile." The Intoxilizer 5000 brochure is silent on this issue. At best, this creates a weak inference that, because the Intoxilizer 5000 brochure did not advertise that the machine was fully mobile, the machine may not have been intended to be used in mobile environments. Accordingly, we are fairly assured that the excluded brochure, if admitted, would only have had a slight effect on the trial court's decision.

We overrule Appellant's second issue.

### Motion to Suppress

In his first issue, Appellant argues the trial court abused its discretion by denying the motion to suppress because the breath test was performed in violation of article 38.23 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005). In his third issue, Appellant argues the trial court abused its discretion by denying the motion to suppress because the breath test was not reliable pursuant to rules 702 and 705 of the Texas Rules of Evidence. *See* TEX. R. EVID. 702, 705(c).

**A.    Standard of Review**

We review a trial court's denial of a motion to suppress under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for abuse of discretion and review the trial court's application of the law to the facts de novo. *Id.* Almost total deference should be given to a trial court's determination of historical facts, especially those based on an evaluation of witness credibility or demeanor. *Gonzales v. State,* 369 S.W.3d 851, 854 (Tex. Crim. App. 2012). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility and may choose to believe or disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). "If the trial judge makes express findings of fact, we view the evidence in the light most favorable to his ruling and determine whether the evidence supports these factual findings." *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We will defer to the trial court's fact findings and not disturb the findings on appeal unless the trial court abused its discretion in making a finding not supported by the record. *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991).

**B.  Legality of Breath Test**

In his first issue, Appellant argues the trial court abused its discretion by denying the motion to suppress because the breath test was performed in violation of article 38.23 of the Texas Code of Criminal Procedure.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.23(a).  Appellant's essential argument is that the Texas Department of Public Safety's Standard Operating Guidelines for the breath test machines does not permit the Intoxilyzer 5000s to be used in a mobile location without an inspection at each new location.  Accordingly, Appellant argues, because the Intoxilyzer 5000 had not been inspected upon being moved to the location where Appellant was tested, the breath test was performed in violation of the law and must be suppressed.

The State argues that, to determine whether a breath test was performed in compliance with the law, courts cannot look beyond the relevant statutes and regulations.  Because the Texas Department of Public Safety's Standard Operating Guidelines are neither statutes nor regulations, the State argues, the Standard Operating Guidelines cannot be a basis for suppressing the breath test.

Article 38.23 of the Texas Code of Criminal Procedure provides,

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

11

*Id.* Typically, "noncompliance with administrative agency rules does not provide a basis for the exclusion of evidence under article 38.23." *Atkinson v. State*, 923 S.W.2d 21, 23 n.1 (Tex. Crim. App. 1996), *abrogated on other grounds by Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002). When a statute specifically makes evidence inadmissible when it has been obtained in violation of agency regulations, however, the regulations become a part of the analysis. *See id.*

In *Atkinson*, the Court of Criminal Appeals held that the then-applicable version of a statute incorporated review of the applicable regulations into the determination of whether there was a violation of article 38.23. *See id.* at 23 & n.1. The State argues that a change in the text of the statute establishes that the regulations do not need to be considered any more.

The statute in effect under *Atkinson* provided, in pertinent part, "Analysis of a specimen of the person's breath, to be considered valid under the provisions of this section, must be performed according to rules of the Texas Department of Public Safety . . . ." Act of May 27, 1983, 68th Leg., R.S., ch. 303, § 3, 1983 Tex. Gen. Laws 1568, 1576–77, *repealed by* Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.15, 1993 Tex. Gen. Laws 3586, 3704 (formerly TEX. REV. CIV. STAT. ANN. art. 6701l–5, § 3(a)).

The State correctly points out that the phrase "to be considered valid" does not appear in the current version of the statute. *See* TEX. TRANSP. CODE ANN.

§ 724.016(a) (Vernon 2011). Instead, the current version of the statute provides, in pertinent part, "A breath specimen taken at the request or order of a peace officer must be taken and analyzed under rules of the department." *Id.* The State argues that the removal of the phrase "to be considered valid" indicates an intention on the part of the Texas Legislature to remove the administrative regulations as part of the review for compliance with the law under article 38.23. We must disagree.

Former article 6701l–5 was repealed and current section 724.016 was enacted due to the creation of the Transportation Code. *See* TEX. TRANSP. CODE ANN. § 1.001 (Vernon 2011). The Revisor's Note to section 724.016 explains,

> Section 3(b), V.A.C.S. Article 6701l-5, provides that analysis of a specimen of a person's breath, "to be considered valid under the provisions of this section," must be performed according to rules of the Department of Public Safety by an individual possessing a certificate issued by the department. The revised law omits the quoted language as unnecessary because it is implemented by the use of the word "must."

*Id.* § 724.016 revisor's note; *see also* TEX. TRANSP. CODE ANN. vol. 1, preface, p. III (Vernon 2011) ("The proposed Transportation Code, as submitted to the Texas Legislature by the Legislative Council, contained Revisor's Notes under various sections. These Notes . . . were not included in the Code as enacted, but are supplied under selected sections in this edition as an aid to research and interpretation."). Additionally, the creation of the Transportation Code was intended to consolidate the relevant statutes for a topic within a code "without

13

substantive change." TEX. TRANSP. CODE ANN. § 1.001(a). Because the creation of the Transportation Code was not intended to make substantive changes to the statutes and because the phrase "to be considered valid under the provisions of this section" was removed because it was considered redundant, we hold *Atkinson* still applies, and we must still look to the administrative code to determine whether there has been a violation of the law.

The question becomes, then, whether the relevant regulations further incorporate the Texas Department of Public Safety's Standard Operating Guidelines into the determination of whether the law has been violated as Appellant argues. Appellant correctly argues that all Texas agencies must perform their breath tests under an approved breath test program. *See* 37 TEX. ADMIN. CODE § 19.4(a), (b)(3), (f)(6). Appellant argues that we must then consider the program's operating guidelines to determine whether the law has been violated. We disagree.

As we note above, typically, "noncompliance with administrative agency rules does not provide a basis for the exclusion of evidence under article 38.23." *Atkinson*, 923 S.W.2d at 23 n.1. The Court of Criminal Appeals held in *Atkinson*, however, that the statutory requirement that "'[a]nalysis of a specimen of the person's breath, to be considered valid . . . , must be performed according to rules of the Texas Department of Public Safety . . . .'" created an exception to the typical

analysis and compelled consideration of the regulations. *Id.* at 23 & n.1 (quoting then-applicable predecessor to section 724.016 of Texas Transportation Code). The requirement that the test be performed according to the regulations drew the regulations into consideration. *See id.*

The corollary language in the Texas Department of Public Safety's regulations provides, "All breath alcohol testing techniques, methods and programs to be used for evidential purposes must have the approval of the scientific director." 37 TEX. ADMIN. CODE § 19.4(a). What is compelled here, as opposed to what was compelled in *Atkinson*, is approval of the scientific director, not performance according to the rules set forth in the standard operating guidelines. *Id.* As long as the regulations have been complied with—including obtaining approval of the scientific director—then article 38.23 has been satisfied. *See id.*; *Atkinson*, 923 S.W.2d at 23 & n.1.

The "scientific director" is "[t]he individual or his designee responsible for the implementation, administration and enforcement of the Texas breath alcohol testing regulations." 37 TEX. ADMIN. CODE § 19.1(20). This is the scientific director for the Texas Department of Public Safety. The testimony at the hearing concerning approval is as follows:

Q. And is [the Intoxilyzer 5000 used on Appellant] certified by the scientific director of the Texas Department of Public Safety?

A. Yes.

15

Q.    And was it certified on the date of January 7th, 2012?

A.    That is correct.

Q.    And is that instrument used as a part of the breath test program?

A.    That is correct.

Q.    Are you responsible for the maintenance of that instrument?

A.    I was, yes.

While not the most direct way of establishing approval of the program by the scientific director, the trial court could have reasonably inferred that the scientific director would not certify a machine for use in a program that had not been approved.[3]

Appellant also relies on subsection (f) of section 19.4 of the Texas Department of Public Safety's regulations to argue that the guidelines are incorporated into the 38.23 analysis. 37 TEX. ADMIN. CODE § 19.4(f). Subsection (f) provides,

> Approval of any breath alcohol testing program is contingent upon the applying agency or laboratory's agreement to conform and abide by any directives, orders, or policies issued or to be issued by the scientific director regarding any aspect of the breath alcohol testing program; this shall include, but not be limited to, the following . . . .

---

[3]    Moreover, this testimony came from Ronald Oliver, a technical supervisor from the Texas Department of Public Safety. "Technical supervisors, when required, shall provide expert testimony . . . concerning the approval of techniques, methods and programs under their supervision." 37 TEX. ADMIN. CODE § 19.4(h). The trial court could have further reasonably concluded that Oliver would not have testified about the validity of a program that had not been approved.

*Id.* This subsection concerns an applying agency's necessary agreements in order to have their program approved by the scientific director. This does not specifically incorporate any of those agreements into the 38.23 analysis. Regulations commonly have requirements in addition to those specifically mandated under the law. But those regulations are commonly left out of the 38.23 analysis. *See Atkinson*, 923 S.W.2d at 23 n.1; *see also Garza v. State*, 126 S.W.3d 79, 85–86 (Tex. Crim. App. 2004) (rejecting reliance on regulation to establish violation of 38.23 because no statute declaring violation of agency rule was violation of law). Accordingly, the mere fact that the agency regulations provide requirements for approval does not establish that the regulations intended to make violations of the agreements constitute violations of law.

We hold that there is evidence in the record that the breath test was obtained in compliance with the law for purposes of article 38.23 of the Texas Code of Criminal Procedure. We overrule appellant's first issue.

## C. Reliability of Breath Test

In his third issue, Appellant argues the trial court abused its discretion by denying the motion to suppress because the breath test was not reliable pursuant to rules 702 and 705 of the Texas Rules of Evidence. *See* TEX. R. EVID. 702, 705(c). As in his first issue, Appellant's essential argument is that the Texas Department of Public Safety's Standard Operating Guidelines for the breath test machines does

not permit the Intoxilyzer 5000's to be used in a mobile location without an inspection at each new location. Because the Intoxilyzer 5000 had not been inspected once it was at the location where Appellant was tested, Appellant argues, the results lack scientific reliability and, accordingly, must be suppressed.

When a defendant challenges the reliability of scientific evidence in a motion to suppress, the State bears the burden at the hearing to establish reliability. *State v. Esparza*, 413 S.W.3d 81, 86 (Tex. Crim. App. 2013). Rule 702 of the Texas Rules of Evidence provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. Typically, in order for scientific evidence "to be considered sufficiently reliable as to be of help to a jury," the evidence must satisfy three criteria: "(1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question." *Reynolds v. State*, 204 S.W.3d 386, 390 (Tex. Crim. App. 2006) (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)).

In the context of breath test evidence, however, the analysis is modified. "[T]he Legislature has already determined that the underlying science is valid, and

that the technique applying it is valid as long as it is administered by individuals certified by, and using methods approved by the rules of, DPS." *Id.* (citing TEX. TRANSP. CODE ANN. § 724.064 (Vernon 2011)). The only determination for a trial court to make in what is called a *Kelly* hearing, then, is "whether the technique was properly applied in accordance with the rules of DPS on the particular occasion in question." *Id.* at 391.

It is in the context of determining whether scientific results were obtained "using methods approved by the rules of DPS" that we agree with Appellant that the determination of whether the standard operating guidelines were followed becomes relevant.[4] In order to make this determination, however, certain evidence presented at the hearing must first be established.

A police officer conducting the breath test does not need to "be able to articulate the scientific principle behind the apparatus or the technology implementing it." *Id.* Instead, the officer must be supervised by a technical supervisor that understands the underlying scientific principles. That technical

---

[4] Even if we held that the guidelines were not followed, we would still have to analyze (1) whether any deviation from the guidelines results in a *per se* determination of unreliability and (2), if not, whether the particular deviation required a determination of unreliability. As the State points out, the Standard Operating Guidelines covers a broad range of matters, including record keeping and electronic data management. In essence, the State is arguing that requiring a *per se* rule would result in a back-door 38.23 analysis for the standard operating guidelines. Because we hold that the guidelines were followed, however, we do not need to reach this issue.

supervisor must also perform periodic tests on the instruments used by the police officers. According to the Standard Operating Guidelines for Technical Supervisors in effect at the time of Appellant's breath test,[5] the technical supervisor must perform two types of periodic tests on the instruments: inspections and calibration. A calibration is a test of known alcohol concentrations to ensure that the machine is correctly identifying the amount of alcohol in its tests. In contrast, an inspection involves (1) ensuring that the machine detects and subtracts the effect of acetone and (2) conducting a breath test in the normal testing mode. Appellant's complaint focuses on the inspection of the machine that he used.

The relevant standard operating guidelines were admitted into evidence. They provide,

> 1.1 An official inspection by a Technical Supervisor can only be conducted at the evidential testing location. Each part of the inspection shall occur at the testing location and includes not only the instrument, but the associated equipment and the testing environment as a whole.
>
> > 1.1.1 The capability of the instrument to detect and subtract the effect of acetone shall be tested.
> >
> > . . . .
> >
> > 1.1.2 A Technical Supervisor shall conduct a breath test in the normal subject testing mode used for evidential testing. . . .

_____

[5] Appellant offered into evidence only the first page of the Standard Operating Guidelines for Technical Supervisors in effect at the time. Nevertheless, Oliver testified as to his responsibilities as a technical supervisor.

1.1.3 A Technical Supervisor may conduct additional tests or checks of the instrument and simulator as he/she deems necessary.

1.2 A complete inspection (1.1) shall be performed by a Technical Supervisor each time an instrument is placed into or returned to service at a testing location.

Appellant's argument focuses on the phrase "testing location" as used in these guidelines. It is undisputed that "testing location" is not defined as it applies to the standard operating guidelines. Appellant argues that "testing location" should be interpreted to mean a fixed, physical location. Based on that interpretation, Appellant argues that the breath testing machines are incompatible with use in a mobile van unless the instrument is inspected each time it moves to a new location.

In contrast, Oliver testified that, for purposes of the breath alcohol testing vans, "testing location" meant the van itself, regardless of the fixed, physical location that the van is in at any given time. He testified,

A testing site is a testing site. Whether it has wheels or not doesn't make any difference. If the testing site is appropriate, then you can get good, valid alcohol results from that instrument. If it's in a bad location, whether it have wheels or not have wheels; that we have testing sites in jails that overheat and there are times when we can't run tests, then that physical location is it's just too hot or too cold.

Oliver testified that the inspection for the instrument in question was performed about one week before Appellant's breath test and that Appellant's test was the first test performed after the inspection.

We agree that "testing location" is not defined as it applies to the standard operating guidelines. We also agree with Appellant that undefined terms like this are typically given their ordinary meaning. *Watson v. State*, 369 S.W.3d 865, 870 (Tex. Crim. App. 2012). We disagree, however, that anything in the guidelines compels the interpretation that the location must be a fixed location.[6] Oliver testified as the representative for the Department of Public Service. The Department of Public Service is the agency tasked with "adopt[ing] rules approving satisfactory analytical methods." TEX. TRANSP. CODE ANN. § 724.016(b)(1). Accordingly, the representative of the agency that drafted the standard operating guidelines pursuant to its legislative authority testified that "testing location" meant the van itself and not the fixed physical location the van might be in at any given time. We hold this interpretation is reasonable and a different interpretation is not compelled.

Appellant argues that the requirement that the inspection includes "the testing environment as a whole" and that such an inspection cannot be conducted when the testing machine is mobile. Oliver acknowledged that inspection includes

---

[6] In civil cases, "[i]f there is vagueness, ambiguity, or room for policy determinations in a statute or regulation . . . we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011). We see no reason that this rule should not apply in criminal cases.

the testing environment as a whole, but also testified that whether a site is mobile is not relevant to the inspection process.[7]  The trial court agreed with Oliver, and we find no reason to overturn this.  Accordingly, we hold the State carried its burden of establishing that "the technique was properly applied in accordance with the rules of DPS on the particular occasion in question."  *Reynolds*, 204 S.W.3d at 391; *see also Esparza*, 413 S.W.3d at 86 (holding State carries initial burden of establishing reliability of scientific evidence).

Once the State carried its initial burden, the burden then shifted to Appellant to establish that the evidence was otherwise unreliable.  *See Pham v. State*, 175 S.W.3d 767, 773 (Tex. Crim. App. 2005) (holding ultimate burden of persuasion is on movant in motion to suppress hearing).  Appellant argued that the breath test was unreliable because the machine was not in the location where it was inspected and, accordingly, there was no assurance that the machine was properly detecting what are known as interferents.  Further, appellant points out that the van was at a gas station, which could contain a large number of unknown interferents in the air.

Oliver testified at trial about the Intoxilyzer 5000's many failsafes for inaccurate breath tests.  The machine tests for the presence of alcohol, specifically

---

[7]  Appellant points out that Oliver also testified that, if he moved a breath test machine assigned to a fixed, physical location, he would perform another inspection of the instrument, even if the machine was moved to a new location in the same room.  There was no testimony, however, that the additional inspection was a requirement of the standard operating guidelines.

ethanol. Ethanol absorbs a specific wavelength of infrared light. When that wavelength of light is passed through the air chamber, less of the light will come out the other side of the chamber due to its absorption by the ethanol. A measure of the decrease in the amount of the infrared light establishes the amount of ethanol present in the sample.

Other known chemicals can also absorb infrared light at the same wavelength. These are called interferents and can potentially cause a false identification of ethanol. To account for this, the machine also tests for five known interferents, such as acetone. If any interferents are detected, the machine subtracts the amount of interferents detected from the total amount detected for the test wavelength.

Every time the machine is run, it performs a test of its internal components to ensure that the circuitry is functioning properly. If it is not functioning properly, the test ends and the report explains an error occurred.

Next, it purges the system of the air in it at the time, drawing in air from its current environment. The machine then tests that air sample. The test subject then breathes into a tube connected to the machine. It then performs another test from the current environment. After that, the machine then tests what is known as a reference sample. The reference sample is designed to produce a result for a specific volume of alcohol. The test subject then breathes again in the tube, and

the machine tests that sample as well. Another sample of the air in the current environment is tested. Finally, the machine draws another sample in from the environment and tests it again.

After the tests are complete, the machine prints out a report showing the results for each test. If any errors occur during the testing, the report explains an error occurred and does not include the testing results. Potential errors include improperly functioning circuitry, overheating, being overly cold, interferents being detected in the ambient air samples, and the two breath samples from the test subject being too far apart.

In the present case, the report did not identify any errors. It identified the alcohol concentration for the first air sample at 0.000. It identified the alcohol concentration for Appellant's first breath sample at 0.158. It identified the alcohol concentration for the second air sample at 0.000. The reference sample was predicted to identify an alcohol concentration of 0.080. The machine identified the alcohol concentration for the reference sample at 0.077. It identified the alcohol concentration for the third air sample at 0.000. It identified the alcohol concentration for Appellant's second breath sample at 0.168. Finally, it identified the alcohol concentration for the fourth air sample at 0.000.

It is important to point out that Appellant did not establish proof of any interferents for which the machine did not already test. In other words, Appellant

did not identify any chemical compounds that would absorb the test infrared wavelength that the machine could not already detect. To the contrary, the air samples from the environment both tested as having an alcohol concentration of 0.000. Appellant argues in his brief that there are a large number of compounds present in the air at a gas station that *could* create a false positive. Similarly, Appellant hypothesizes that there could be compounds that would not be detected in the air but might create false positives when metabolized and exhaled in human breath. This is pure speculation, however, and does nothing to advance Appellant's burden of persuasion or to show how the trial court abused its discretion. *See Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) (holding speculation is insufficient to carry burden).

The most substantive proof of failure to detect interferents came from the testimony of Appellant's expert, McMains. McMains testified that he was aware of some tests where ethanol and acetone were tested in a sample together. "And a few times it did not detect that. And in one case it didn't subtract it because they used a .08 solution and it showed up a .09." Based on this testimony, the greatest potential variance that has been established is a difference of 0.01 when ethanol and acetone were present together. Appellant's breath tests, however, were 0.158 and 0.168. The legal limit in Texas is 0.08 grams of alcohol per 210 liters of breath. *See* TEX. PENAL CODE ANN. §§ 49.01(1)(A), (2), 49.04(a) (Vernon 2011).

Even if the trial court found this testimony credible and credited it, adjusting the variance in the combined presence of alcohol and acetone, Appellant's lowest breath test was still 0.068 grams of alcohol per 210 liters of breath over the legal limit. We hold the trial court could have reasonably determined that, in Appellant's circumstances, a potential 0.01 variance did not render his breath test unreliable.

McMains also testified that, based on his study of breath tests conducted throughout the state from 2007 to 2011, "the Houston [breath alcohol testing] vans were nine times more likely to detect an interferent than a nonmobile Intoxilyzer site." Even assuming the trial court found this testimony credible and credited it, McMains's testimony concerns the machines' successful detection of interferents. Given the uncontradicted testimony that the machines would report an error when it detected interferents in the ambient air and would exclude the effects of interferents when present in breath samples, Appellant has failed to establish how such detections would cause the test results to be unreliable.

We hold the State carried its burden of establishing that the breath tests were reliable. We hold Appellant failed to carry his burden, after the burden shifted to him, that the tests were unreliable. Accordingly, we overrule Appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.

Justice Brown, concurring in part and dissenting in part.

Publish. TEX. R. APP. P. 47.2(b).