**Opinion issued June 26, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00621-CR

———————————

**CHRISTAPHER RYAN JONES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Case No. 1730731**

## MEMORANDUM OPINION

A jury found appellant Christapher Ryan Jones guilty of the felony offense of murder,[1] and the trial court assessed his punishment at twenty years' confinement. In two issues, appellant contends that (1) the trial court erred in admitting

---

[1] *See* TEX. PENAL CODE ANN. § 19.02.

photographs of appellant's weapons, firearm magazines, and ammunition as well as the actual magazines and ammunition over defense counsel's objections because the evidence was irrelevant and unfairly prejudicial, and (2) the admission of such evidence harmed him.

We affirm.

## Background

Appellant was charged with the murder of Richard Allen Powell, the complainant. Appellant pleaded not guilty, and the case was tried to a jury. The State called numerous witnesses including Jason Krogman, Benito Marroquin, Dr. Rafael Garcia, Houston Police Department ("HPD") Officer J. Schmidt, Houston Forensic Science Center ("HFSC") Investigator J. Matos, Jill Dupre, Harris County Sheriff's Office Sergeant M. Schmidt, and Barbara Powell. Appellant testified for the defense.

### 1. Jason Krogman

On July 9, 2021, at approximately 6:30 a.m., Krogman was sleeping in his recreational vehicle ("RV") parked in a lot next to a snow cone stand owned by his sister on El Dorado Boulevard. When his dog began barking, Krogman woke up to find the complainant sitting in the passenger seat of Krogman's Volvo parked in the field near his RV. Krogman asked the complainant what he was doing, told him that he did not have permission to be in his car, and asked him to leave. Krogman

testified that he did not call the police because he was trying to handle the situation himself.

The complainant returned to his own car and began driving through a muddy field when his vehicle got stuck. Krogman walked into the field to tell the complainant that he needed to leave. The complainant told Krogman that he could not leave because his vehicle was stuck in the mud. The complainant then walked over to a nearby gas station. Soon after, Krogman saw a blue pickup truck drive onto the field to try and pull the complainant's car out of the mud. The driver was later identified as Benito Marroquin, a maintenance worker from a nearby apartment complex.

Krogman testified that the blue truck got stuck in the mud and the complainant and Marroquin began arguing. Krogman offered to find someone to help them get their vehicles out of the mud. Krogman called appellant—whom he had met two days earlier when appellant had expressed interest in buying one of Krogman's pickup trucks—because he knew appellant had a four-wheel drive Chevy truck. Appellant arrived at the field in less than ten minutes. Krogman returned to his RV.

About fifteen minutes later, Krogman walked back out to the field and saw the complainant carrying tow straps. Krogman asked the complainant if he had taken the straps from Krogman's boat, and the complainant told him he had. Krogman

3

asked the complainant to return the straps when he was finished with them. Appellant also told the complainant to return the straps to Krogman's boat.

Krogman testified that when the complainant tossed the tow straps on the ground, appellant pulled a gun out and shot at the complainant. Krogman testified that he heard the shot, but he did not see anything come out of the gun and assumed that appellant had shot a blank. The complainant told appellant, "[Y]ou pulled a gun on me," and that he was going to call the police as he began walking away. Appellant then fired at least six more shots at the complainant. Krogman testified that appellant returned to his truck, rolled his window down, and mouthed "I'm sorry" before leaving the scene. Krogman ran to a nearby gas station and called 911. He passed a woman screaming in the gas station parking lot who was later identified as the complainant's mother. When the first officer arrived on the scene, Krogman pointed to appellant's truck which was stopped at a red light.

### 2. Benito Marroquin

Marroquin, an assistant maintenance employee at a nearby apartment complex, was at work on the day of the shooting. After arriving at the complex that morning, Marroquin went to a nearby gas station to buy cigarettes and an energy drink. He testified that a man who looked "like a homeless dude," later identified as the complainant, approached him and asked for help getting his truck out of a field.

Marroquin drove his truck onto the field where it got stuck in the mud. He testified that the property owner's brother (Krogman) walked out and told them that a man with a four-wheel drive truck (appellant) was coming to help. When appellant arrived, Marroquin approached his truck. Appellant pointed a gun at him and told him to get away from his truck. Marroquin raised his hands in the air and told appellant he was there to help. When appellant realized that Marroquin was "the helper," the two men shook hands.

As Marroquin, Krogman, and appellant walked to the field, the complainant approached them carrying a tow strap and a shovel and said, "I got something to help ya'll out." When the complainant told Krogman that he got the tow strap from Krogman's boat, Krogman told him, "Take it back there right now." Instead, the complainant set the strap and a shovel on the ground, and appellant became upset and pulled a gun from his waistband. Appellant then shot the gun, but it misfired. Marroquin testified that the complainant began "running his mouth" and said, "I got a gun" and "[I]f I had my gun right now . . . ." Appellant replied, "That's your problem you don't have it with you."

Marroquin tried to defuse the situation and take the tow strap back to Krogman's boat. The complainant told appellant that he was going to walk over to his mother who had just arrived and they would call the police. As the complainant turned to walk to his mother, appellant fired at him, unloading the entire clip, and

5

the complainant fell to the ground. Concerned that appellant might "do away with the witness" because Krogman had run away and Marroquin and appellant were the only ones still in the field, Marroquin asked appellant whether he was still going to help get his truck out. Appellant initially agreed but, after several unsuccessful attempts, Marroquin told appellant "Just forget about it," and appellant "t[ook] off."

### 3. Dr. Rafael Garcia

Dr. Garcia, an assistant medical examiner at the Harris County Institute of Forensic Sciences, testified that the complainant's cause of death was related to multiple gunshot wounds and the manner of death was homicide.

### 4. Officer J. Schmidt

HPD Patrol Officer Schmidt was dispatched to the scene of the shooting. As he approached the location, he saw a male (appellant) in the bed of his pickup truck stopped at a red light. Two witnesses approached the officer and told him that the shooter was leaving in a truck and pointed at the vehicle driving away from the traffic light. Officer Schmidt began following the truck, which pulled into a nearby Shell gas station moments later. As appellant began walking toward the entrance of the gas station, Officer Schmidt approached him, with his gun drawn, ordered him to get on the ground, and handcuffed him. When Officer Schmidt asked appellant if he had shot someone, he said that he had. Appellant told the officer that he had been

in fear for his life and that he was sorry. The officer placed appellant in the back of his patrol car.

### 5. Investigator J. Matos

Before Matos took the stand, and outside the presence of the jury, defense counsel objected to Matos's anticipated testimony about certain ammunition and firearms—other than the weapon appellant used to shoot the complainant—that he found during his inventory search of appellant's truck. Defense counsel also objected to the State's anticipated introduction of the actual weapons and ammunition recovered from appellant's truck as well as photographs of such evidence. Defense counsel argued that the objected-to testimony and evidence was irrelevant and any probative value it might have was outweighed by unfair prejudice. He asserted that it was undisputed that appellant shot the complainant, and therefore, Matos's anticipated testimony and the physical evidence was only being introduced to show that appellant had engaged in other nefarious or criminal acts.

The State responded that it did not intend to offer the complained-of testimony and physical evidence to show that appellant had engaged in extraneous bad acts or as character evidence. With regard to the relevancy objection, the State argued that the testimony would be offered to rebut the defensive theory that the police conducted a sloppy investigation and show that law enforcement conducted a thorough inventory search of appellant's truck. The State further argued that the

7

admission of the additional firearms into evidence would show that appellant had knowledge and possession of the weapons because the green bag in his truck in which the murder weapon was found also contained the AK-47 recovered from appellant's truck. Additionally, the State pointed out that defense counsel had argued in his opening statement that appellant did not stay at the scene of the shooting because he wanted to go to a safe place. The State argued that the admission of the additional weapons and the ammunition would counter that defensive theory and show that appellant was aware of and possessed several different firearms in his truck that he could have used to protect himself. Defense counsel responded that his position that police did not conduct a proper investigation related only to the scene of the shooting and that he did not intend to argue that police failed to thoroughly search appellant's truck.

The trial court overruled defense counsel's objections to Matos's anticipated testimony and the above-referenced physical evidence.

In the presence of the jury, Matos, a crime scene investigator with the Houston Forensic Science Center ("HFSC"), was assigned to process and inventory a Chevy Silverado for firearms evidence. Matos testified that the inventory took about two days to complete.

During the search of the inside of the truck, Matos found, among other things, a backpack containing a shotgun, a box containing rifle rounds and shotgun shells,

a greenish-grey bag on the rear driver's-side seat containing rifle magazines and multiple ammunition boxes, and a mason jar containing multiple ammunition rounds. In the bed of the truck, Matos found a plastic crate containing a large quantity of rounds of various calibers of ammunition, a wooden crate containing several boxes of multiple types of handgun and rifle cartridges and shotgun shells, and a canvas duffel bag containing a rifle, several magazines with multiple cartridges, an empty rifle magazine, an empty handgun magazine, one 12-gauge shotgun shell, and a Browning 9mm pistol. Matos testified that he collected more than one thousand pieces of firearm evidence from the vehicle. The photographs of the vehicle inventory were admitted into evidence. The trial court also admitted into evidence eleven rifle magazines and the crate of ammunition containing approximately 1,000 rounds.[2]

### 6. Jill Dupre

Dupre is an HFSC firearms examiner. She testified that the twelve fired 9mm casings collected at the scene of the complainant's shooting had been fired from the Browning 9mm pistol found in appellant's truck. Through Dupre, the Browning 9mm pistol and its magazine were admitted into evidence.

---

[2] Appellant again objected to the admission of the physical firearm and ammunition evidence on the grounds that the physical evidence was more prejudicial than the photographs of the items because the actual items made it appear that "this [wa]s just a big dangerous thing when it involve[d] one pistol." The State did not offer into evidence the AK-47 rifle or the shotgun.

### 7. Sergeant M. Schmidt

Sergeant Schmidt with the Harris County Sheriff's Office is one of the three administrators of the inmate telephone system for the Harris County jails. Through Sergeant Schmidt, the State introduced a jail phone call placed by appellant to his mother.[3]

### 8. Barbara Powell

Powell is the complainant's mother. In the early morning of July 9, 2021, she spoke with the complainant who told her that he had gotten her car stuck in mud. Powell got a ride to the complainant's location on El Dorado Boulevard so that she could give him money for a tow truck. When she arrived, she saw the complainant standing in a field with two men next to her car and a blue truck. She began running toward the complainant and waving at him to let him know that she was there.

Powell further testified that the complainant was looking at one of the men with his hand up in the air. As she turned to let her ride know that she had found the complainant, she heard a couple of pops. She then approached and found the complainant on the ground. He had blood on his shirt, and his eyes were open. The two other men ran to the right. Powell went and stood in front of appellant's truck

---

[3] The State later called Officer Schmidt as a rebuttal witness and, through him, introduced a second jail call between appellant and his mother.

as he tried to drive away and said, "[W]hy did you shoot my baby?" Appellant responded, "He had a gun." Powell replied, "Rich don't carry a gun – weapons."[4]

### 9. Appellant

Appellant testified that he first used drugs when he was thirteen years old. He began using methamphetamines when he was seventeen or eighteen years old. He has had periods of sobriety but had always relapsed. Appellant testified that there were times when he was homeless and lived in his truck. He kept personal items in his truck such as toiletries and a rifle, a shotgun, a handgun, and a box of ammunition.

Appellant was living out of his truck on July 9, 2021. Around 11:00 a.m., he received a call from Krogman, whom he had met the previous week when Krogman helped inflate a flat tire on appellant's truck. Krogman told appellant that a man had broken into Krogman's car and gotten his truck stuck in the mud, and another man had gotten his truck stuck trying to help. Krogman asked appellant to help tow the two men's trucks and told appellant that they would probably give him some money to do it. Appellant agreed and drove to a business near where Krogman lived.

Appellant testified that Krogman wanted him to get the vehicles out of the mud as soon as possible. When appellant arrived, Krogman seemed agitated and

---

[4]     Following Powell's testimony, the defense moved for a directed verdict which the trial court denied.

frustrated with having to deal with the situation. Appellant asked Krogman if he could come onto the property with his firearm because the situation seemed "fishy," and Krogman told him he could. Appellant put his Browning 9mm pistol in his front right pocket and got out of his truck.

As appellant walked toward the field, Marroquin approached his truck. Because appellant did not know him, he put his hand out and told Marroquin to slow down and that he would walk to Marroquin. When Marroquin told appellant that he was the person whose vehicle got stuck trying to help the complainant, appellant walked to him and shook his hand. Appellant and Marroquin walked to the field to assess the situation. Krogman came out of his RV to explain what had happened. Appellant testified that he did not pull his gun out.

While the three men stood in the field, the complainant approached them carrying tow straps and a shovel. Krogman raised his voice and asked the complainant whether he had taken the tow straps and a shovel from Krogman's boat. When the complainant said that he had, Krogman told him to return them to his boat. Appellant testified that he also told the complainant to take them back because he had straps and could pull the vehicles out. Appellant took the shovel from the complainant.

Appellant testified that the complainant became flustered and irate and said, "Oh, you're gonna pull a fucking gun on me? I got a gun, too, fucking n[*]gger."

12

Appellant testified that he felt very scared. In an attempt to calm the complainant, Marroquin said that he would return the tow straps and shovel to Krogman's boat. Appellant testified that the complainant then stepped past the others and said, "[M]y mom's here, I'm gonna get her, I'm gonna call the cops on you because you're gonna pull a gun on me."

Appellant testified that, as the complainant began walking away, the complainant said, "If you're gonna pull a fucking gun on somebody, this is how you do it." The complainant turned toward appellant with his hand in his pocket. Appellant pulled his gun out and shot at the complainant multiple times. Appellant went to his truck to get his cell phone when the complainant's mother walked up to him and asked, "[W]hy did you shoot my baby?" Appellant apologized and said he was in fear for his life and the complainant had said that he had a gun.

Appellant testified that he got back in his truck to go find help and drove to a nearby gas station. As he walked toward the gas station store, an officer told him to get on the ground. After the officer handcuffed him, the officer asked him if he had shot someone. Appellant said that he had been in fear for his life, and that the complainant had said that he had a gun.

On cross-examination, the State asked appellant about a jail telephone call with his mother five days after the shooting:

13

Q:     My question was: Do you remember telling, five days after the murder, to your mother, that you apologized to [Marroquin] for pulling a gun out, the pistol out on him?

A:     Yes, sir.

Q:     And that when [the complainant] came at you with a shovel, you told your mother that you pulled the hammer back and it made a clicking sound?

A:     Yes, sir.

Q:     And that that must be why "they," referring to [Marroquin] and [Krogman], thought the gun misfired?

A:     Correct.

Q:     And you also told her that after [the complainant] told you, "I've got a gun, too," your response was, "Okay, even better of a reason for me to be prepared. My buddy just got shot. I'm not gonna get shot, too," right?

A:     Yes, sir.

Q:     And that was referring to Allen, your drug dealer friend?

A:     Yes, sir.

Q:     And then you told her, describing your mental state at the time, quote, "Fuck this because I'm not a bitch. I'm not gonna make sure – I'm going to make – I'm going to do what I need to do and this does what it needs to do." You remember telling her that?

A:     Yes, sir.

Q:     When you said, "This does what it needs to do," you were referring to your 9-millimeter?

A:     Yes, sir.

14

Q:    And then you described to your mother in that same call [the complainant's] response where he said – where you said, quote, "He's like, 'Now you pulled yours out, I'll tell you, I ain't got mine on me, little bitch white boy.'" That's what you said, told your mom that [the complainant] told you?

A:    Yes.

Q:    And then he said to you, quote, "Why don't you shoot me in the back if you're a real man?"

A:    Correct.

Q:    And then you told her, quote, "I didn't realize I emptied the whole fucking clip?"

A:    Yes, sir.

Q:    And that you said, "I guess I overdid it?"

A:    Yes, sir.

The jury found appellant guilty of the charged offense. Following the punishment phase, the trial court assessed appellant's punishment at twenty years' confinement.

## Admission of Evidence

In his first and second issues, appellant contends that the trial court erred in admitting into evidence the actual firearms and ammunition found during the inventory search of appellant's truck and the photographs of the shotgun, AK-47 rifle, firearm magazines, and approximately 1,000 rounds of ammunition because

15

the evidence was irrelevant and unfairly prejudicial, and he was harmed by their admission.

## A.  Standard of Review and Applicable Law

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016).  A trial court abuses its discretion if the decision falls outside the zone of reasonable disagreement. *Id.* at 83.  Before we may overrule a trial court's evidentiary decision, we must find that the trial court's ruling was "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)).  We will uphold the trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De la Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## B.  Relevance Under Texas Rules of Evidence 401 and 402

Appellant argues that the evidence that he possessed additional firearms and ammunition in his truck was irrelevant because the trial centered on one issue: whether he shot the complainant in self-defense.  Appellant asserts that there was no dispute that he shot the complainant or that he did not brandish the AK-47 rifle or the shotgun.  Thus, he argues, the firearms and ammunition in his truck did not make it more or less likely that he shot the complainant in self-defense.

16

"Relevant evidence is generally admissible, irrelevant evidence is not." *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018) (citing TEX. R. EVID. 402). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. "Evidence does not need to prove or disprove a particular fact by itself to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving a fact of consequence." *Gonzalez*, 544 S.W.3d at 370.

A review of the record shows that the parties disagreed on why appellant fled the scene following the shooting of the complainant. The State considered it as evidence of guilt while the defense asserted that appellant left the scene out of necessity. *See Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) (noting evidence of flight is relevant to show consciousness of guilt); *see also Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) ("[A] factfinder may draw an inference of guilt from the circumstance of flight."). In his opening statement, defense counsel told the jury that he had left the scene of the shooting to go to "a safe place . . . the Shell station." Appellant testified that he went to the Shell station after shooting the complainant because it was the only safe place he knew of at the time. Later, when the State asked appellant, "And you're telling the jury that you had to get to a safe place at this point?," appellant responded, "[Y]es."

17

The State asserts, as it did in the trial court, that it introduced the complained-of evidence of firearms and ammunition found in appellant's truck to rebut the defensive theory that appellant fled the scene to go somewhere safe.[5] According to the State, the evidence showed that appellant knew he had more firepower in his truck and therefore knew that he did not need to flee the scene to protect himself. Thus, it argues, this evidence had a tendency to make the fact that appellant fled the scene to get somewhere safe less probable. *See* TEX. R. EVID. 402. We agree.

Evidence of appellant's mental state at the time he shot the complainant was a fact of consequence in a case where appellant claimed self-defense. *See Gonzalez*, 544 S.W.3d at 371. The State was entitled to present evidence to refute appellant's defensive theory that he fled the scene to go somewhere safe. The evidence of appellant's shotgun, AK-47 rifle, and ammunition, coupled with his testimony that the only place safer than his truck in which he had weapons and ammunition was "home," tended to make the fact that appellant fled the scene to get somewhere safe less probable. *See* TEX. R. EVID. 401. The trial court did not abuse its discretion in

---

[5] In his brief, appellant acknowledges that "[t]he State's third argument—that the shotgun, AK-47 [rifle], and ammunition were relevant to rebut [a]ppellant's argument that he left the scene to get to a safe place because he could have used the firearms to defend himself—arguably made the guns and ammunition relevant."

finding the complained-of firearm and ammunition evidence relevant under Rule 402.

## C. Balancing Test Under Texas Rule of Evidence 403

Appellant argues that the trial court erred in admitting the complained-of firearm and ammunition evidence because its probative value was substantially outweighed by danger of unfair prejudice.

Even if relevant evidence is offered and admissible, a trial court may nonetheless exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403; *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990). "Probative value" refers to "the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). The term "unfair prejudice" is the "tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* "The fact that an item of evidence shows the defendant in a negative light is not sufficient to justify its exclusion on [Texas] Rule [of Evidence] 403 grounds." *Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021). Almost all evidence offered against the defendant will be prejudicial; Rule 403 only prevents evidence that is unfairly prejudicial. *Id.* Before excluding

19

evidence, a court must balance these factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005). A trial court should exclude evidence under Rule 403 "only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010).

Appellant asserts that the probative value of the evidence of appellant's shotgun, AK-47 rifle, and ammunition found in his truck and the State's need for the evidence were minimal. He asserts that the fact that he had access to other firearms in his truck did not negate his need to leave the scene for a more secure location. He points out that the firearms were not on his person and he would have had to retrieve them either from the back seat of his truck (the shotgun) or the bed of his truck (the rifle)—actions which would have taken much longer to complete than quickly driving away from the scene. He also notes that the nature of his flight was undisputed; that is, he did not lead the police on a lengthy chase, he drove to a nearby gas station, he stopped at a red light along the way, parked, and was walking to the entrance of the gas station store when he was arrested. Thus, he argues, the weapons and ammunition found in his truck had no bearing on the nature of his "flight" from the scene.

The nature of appellant's flight was not undisputed. Appellant claimed that he needed to leave the scene of the shooting to get to a safe place. The State introduced evidence of his firearms and ammunition in his truck explicitly to negate that need. *See Robinson v. State*, 236 S.W.3d 260, 269 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (finding evidence that when defendant was arrested he was in possession of firearm probative because it provided jury with information essential to understanding context and circumstances of crime). The evidence of appellant's flight was probative of his consciousness of guilt and enhanced the State's case. *See Bigby*, 892 S.W.2d at 884 (concluding trial court's ruling was within zone of reasonable disagreement because evidence that defendant—who had pled insanity and did little to contest his guilt—threatened trial judge with gun and attempted to flee was highly probative of defendant's guilt and enhanced State's case); *see also Goldsmith v. State*, No. 14-12-00614-CR, 2014 WL 261007, at *3 (Tex. App.—Houston [14th Dist.] Jan. 23, 2014, no pet.) (mem. op., not designated for publication) (noting trial court's ruling was probably within zone of reasonable disagreement where evidence of flight enhanced State's case).

Appellant also argues that the potential of the evidence to impress the jury in some irrational, yet indelible, way and the time the State took to develop the evidence were extreme. He asserts that although it was clear that he legally owned the firearms and ammunition, it was highly likely that some members of the jury

21

would have been alarmed and scared by the firepower he possessed and more inclined to view his firearms and ammunition as evidence that he was a "dangerous gun nut," rather than as rebuttal evidence of appellant's claim that he needed to get to a safe place. In support of his argument, he points to the fact that the State did not argue in its closing argument that the guns and ammunition rebutted his safe place claim but instead used the evidence to characterize him as an unhinged man with an "itchy-trigger-finger" and a "short . . . fuse." He also asserts that the length of time the State took to develop this evidence was substantial because nearly all of Officer Matos's testimony was devoted to developing the evidence.

In arguing about the admissibility of the evidence, the State made clear that it had no intention of offering evidence that the guns were stolen or otherwise possessed illegally. And there is nothing in the record showing that the State asserted or suggested that appellant possessed the guns illegally. Mere possession of a gun "is not, in and of itself, a criminal offense or a bad act." *Robinson*, 236 S.W.3d at 270; *see also State v. Garcia*, No. 13-13-00185-CR, 2013 WL 4769437, at *5 (Tex. App.—Corpus Christi–Edinburg Sept. 5, 2013, pet. ref'd) (mem. op., not designated for publication).

As to the time spent by the State to develop the evidence, Officer Matos's testimony spanned approximately fifty-three pages of the reporter's record transcript and only roughly half of his testimony was spent developing the evidence. The

reporter's record transcript for the guilt phase of the trial is more than 1,000 pages long, and Matos's testimony comprised approximately five percent of the entire reporter's record. This evidence did not consume an inordinate amount of time. *See Deggs v. State*, 646 S.W.3d 916, 927 (Tex. App.—Waco 2022, pet. ref'd) (concluding alleged victim's testimony that comprised approximately ten pages of the more than 250 pages of reporter's record transcript did not consume inordinate amount of time); *see also Berg v. State*, No. 01-22-00248-CR, 2023 WL 5616200, at *17 (Tex. App.—Houston [1st Dist.] Aug. 31, 2023, pet. ref'd) (mem, op., not designated for publication) (finding victim's testimony did not consume inordinate amount of time where testimony spanned approximately twenty-one pages of 250-page reporter's record transcript).

After reviewing the facts and applying the factors noted above, we hold that the trial court did not abuse its discretion in concluding that the danger of unfair prejudice did not substantially outweigh the probative value of the complained-of evidence. The trial court did not err in admitting the evidence.

We overrule appellant's first issue.

**D.    Harmless Error**

However, even if the trial court erred in admitting this evidence, the error was harmless. Generally, errors concerning the admission of the State's evidence over a defendant's objections are non-constitutional errors. *See Easley v. State*, 424 S.W.3d

23

535, 539 (Tex. Crim. App. 2014); *Wilson v. State*, 451 S.W.3d 880, 886 (Tex. App.—Houston [1 Dist.] 2014, pet. ref'd). Non-constitutional errors that do not affect the defendant's substantial rights must be disregarded. *See* TEX. R. EVID. 103(a); TEX. R. APP. P. 44.2(b); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). A substantial right is affected, i.e., the error is harmful, if the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Morales*, 32 S.W.3d at 867. The error is harmless, however, if we have a fair assurance that the error did not influence the jury or had but a slight effect. *See id.*

When analyzing the likelihood that a jury's decision was affected by erroneously admitted evidence, we consider everything in the record, including the testimony and physical evidence admitted, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with the other evidence, the jury instructions, the State's and defendant's theories of the case, and closing arguments. *See Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). It also is relevant whether the State emphasized the error in closing argument or otherwise. *See id.* The presence of overwhelming evidence supporting a finding of guilt is a legitimate factor in evaluating the harm the error caused. *See id.* at 356; *Friend v. State*, 473 S.W.3d 470, 482 (Tex. App.— Houston [1st Dist.] 2015, pet. ref'd).

Appellant argues that if the trial court had excluded the evidence of his rifle, shotgun, and ammunition, the jury would have been left with deciding a credibility contest among Krogman, Marroquin, and appellant. He asserts that the jury could have weighed all the contradictory testimony and reasonably found appellant guilty or not guilty depending on which witness it chose to believe. Instead, he argues, the admission of the complained-of firearm and ammunition evidence gave the jury an "objective" reason to view appellant "as an unhinged, dangerous gun nut" and convict him based on a negative stereotype.

The jury was presented with overwhelming evidence of appellant's guilt. Krogman and Marroquin testified that appellant pulled his firearm on the complainant because the complainant dropped the tow straps on the ground instead of returning them to Krogman's boat, as Krogman and appellant had instructed him to do. Marroquin testified that appellant became upset when appellant dropped them. Krogman and Marroquin testified that appellant shot once at the complainant, but that the gun misfired. Marroquin testified that the complainant began "running his mouth," and both Krogman and Marroquin testified that the complainant told appellant that he was going to call the police in response to the shot and began walking away. They testified that appellant fired multiple shots at the complainant after he heard the complainant threaten to call the police.

The jury also heard evidence of appellant's subjective guilt about shooting the complainant. Krogman testified that appellant mouthed, "I'm sorry," to him as he drove away from the scene. And Marroquin told an officer who spoke to him that appellant started crying after he shot the complainant and said, "Oh, my God, why did I do that? Why did I do that?" before fleeing the scene. The jury also heard appellant's own statements to his mother that, after he pulled out his gun, the complainant said, "Now you pulled yours out, I'll tell you, I ain't got mine on me, little bitch white boy" and "Why don't you shoot me in the back if you're a real man?" Appellant testified that he told his mother, "I didn't realize I emptied the whole fucking clip" and "I guess I overdid it." There is significant evidence of appellant's guilt based on Krogman's and Marroquin's description of the events, their testimony about appellant's reaction after he shot the complainant, and appellant's statements to his mother about what the complainant said prior to being shot.

Appellant asserts that the State highlighted the firearm and ammunition evidence in its closing argument without mentioning the reason for which it was admitted, i.e. to rebut the defense's theory that appellant fled the scene to find a safe location.[6] In particular, he points to the following statements in the State's closing

---

[6] In its closing argument, the State commented:

> [Appellant] tells his mom, "I'm gonna be honest to the extent to get me out of here," and that's what we saw on the witness stand today.

argument: (1) "The defendant showed up to that muddy field armed with three guns, close to a thousand bullets, high on meth . . . ."; (2) "I want you to know that by your verdict you can keep these guns off the streets, you can keep the defendant from hurting anyone else"; and (3) "[By finding appellant not guilty] [y]ou will have sent him into the world armed with the knowledge that he can show up with no information; no training; leaving his firearm, his rifle, in the bed of his truck for anyone to come up and grab overnight and endanger your community, that he can do all of these things." Contrary to appellant's assertion, these statements were not "incendiary" and comprised only a small portion of the State's entire closing argument. *See, e.g.*, *Mosley v. State*, 983 S.W.3d 249, 260 (Tex. Crim. App. 1998) (concluding State's comments during closing argument that implied defense counsel wanted to divert jury from truth, even if inappropriate, were harmless in light of mildness of comments and strength of State's case).

Given the record before us, we conclude that the admission of the complained-of firearm and ammunition evidence did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Garcia,* 126

We see – he told you that he just wanted to get to help; he wanted to get to a safe place; he wanted to figure out how to call the police from a safe location, even though he should have turned left to get to his mom's house. He had a cell phone in his truck along with the other two guns.

S.W.3d at 927.  Any error by the trial court in admitting this evidence was harmless.

*See Motilla,* 78 S.W.3d at 357.

We overrule appellant's second issue.

## Conclusion

We affirm the trial court's judgment.

Kristin M. Guiney
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

Do not publish.  TEX. R. APP. P. 47.2(b).